[Civ. No. 6547. Second Appellate District, Division Two.—February 24, 1931.]

REX B. MURRAY, Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), Appellant.

W. I. Gilbert for Appellant.

Glensor, Clewe, Van Dine & Turcotte for Respondent.

ARCHBALD, J., *pro tem.*—Plaintiff brought this action to recover damages for injuries alleged to have been sustained by certain livestock of his shipped over the lines of defendant from Gordon, California, to Hynes, California. The case was tried before a jury, which returned a verdict in favor of the plaintiff for the sum of $1250 and from the judgment entered thereon the defendant appealed.

The complaint alleges and the amended answer admits that the plaintiff delivered to defendant as common carrier, and defendant so received at Gordon, California, ''certain ordinary livestock known as stock cattle, more particularly described as thirty-five cows''. The contract used for the shipment was the form provided by the Interstate Commerce Commission and adopted by carriers in official southern and western classification territories, March 15, 1922, and known as the ''Uniform Livestock Contract'', and is used for the shipment of livestock and wild animals instead of the uniform bill of lading, and it provides in part that ''Whereas, the classification and tariffs under which the agreement is made require that for the purpose of applying the lawful rate of freight the shipper must declare the shipment to be 'ordinary live stock', specifying the kind or kinds of animals, or if not 'ordinary live stock' he must declare the kind and value of each animal, space for such declaration being printed below.'' Then under the heading ''Ordinary Live Stock'' appears the following: ''Ordinary live stock means all cattle, swine, sheep, goats, horses, and mules, except such as are chiefly valuable for breeding, racing, show purposes, or other special uses. On shipments of ordinary live stock

no declaration of value shall be made by the shipper, nor shall any values be entered on the bill of lading.

"I (we) declare the shipment covered on this bill of lading to be ordinary live stock. ———— Shipper."

Following the above is another heading, "Other than ordinary live stock", under which appears the following: "On shipments of live stock chiefly valuable for breeding, racing, show purposes, or other special uses different rates of freight are in effect dependent on the valuation placed thereon by the shipper, which valuation may be the basic valuation as stated in the classification, at which the lowest freight rate applies, or it may be any higher valuation up to actual value, in which event the freight rate will be higher by the amount prescribed in the tariffs or classification. Such declared or agreed values shall be entered in the column provided therefor in this bill of lading, and in no event shall the carrier be liable for any amount in excess of such valuation.

"I (we) declare the shipment covered by this bill of lading to be other than ordinary live stock, and of the value herein declared, or agreed upon, and entered. ———— Shipper."

The plaintiff as shipper did not sign his name to either of such declarations in the contract involved here. There are other headings in the contract of interest here as follows:

| "Number and Description Animals" | "Shippers declared value (If on live stock for breeding racing show purposes or other special purposes)" |
|---|---|
| "Weight (Subject to correction)" | "Rate of freight" "Per 100 lbs." "Per car" |

In the contract before us the following insertions appear to have been made under the heading, number and description of animals, "35 head stock cattle feeders", and under weight, the figures "23600". Under the heading "shippers declared value" appears the following, "50/100" and there is no insertion in the blanks under the heading "rate of freight". Testimony was also introduced to the effect that the carload rate for transporting ordinary livestock in a standard 36-foot car (which is the kind used in the shipment here) between Gordon, California, and Los Angeles, where plaintiff took delivery and shipped them on to Hynes

by truck, was $97. This standard rate is made applicable to all shipments of "ordinary live stock", and is the amount the plaintiff testified that he paid. The plaintiff also testified that he paid $55 per head for the cows shipped, or a total of $1925. He also testified on cross-examination that he sold the cattle in their damaged condition for $2,188.85, although the total itemized sales as shown by evidence only makes $2,098.50. It was also brought out on cross-examination that his total expense on the trip, some of which was apparently made necessary by reason of the alleged physical condition of the animals, was $723.50.

While appellant has urged several contentions they all revolve around the questions (1), Did the court apply the proper rule for measuring damages in its admission of evidence and instructions to the jury, and (2), Does the contract fix the limit to the damages provable of $50 per head?

As we have said the complaint alleges and the answer admits that the stock shipped in the instant case consisted of "ordinary live stock known as stock cattle, more particularly described as thirty-five cows". With regard to the market value of the cows at Hynes, the point of destination, Mr. Rule, a witness for the plaintiff, testified over the objection of defendant that the market value of cattle of the same kind and character as the cattle here "at date of arrival was $125 to $130 per head". He also testified that one cow of the shipment was worth $6 or $7, four or five others were worth $10 each and the balance of the shipment about $65 each, all in the condition in which they actually arrived. On cross-examination it developed that he was basing his value on "dairy cattle". Robert Zangle, another witness of plaintiff's, also testified over defendant's objection that the market value of five of the cows observed by him at Hynes about the time of their arrival, in an uninjured condition was from $125 to $135 per head, and that in their injured condition four of them were worth $10 a head, and one about $7. The witness also testified: "By Mr. Gilbert: Q. Well, you would not have the jury understand for a minute that those cows could be driven down here in the general stock yards and be sold without reference to their dairy value and bring any such value as that— that is what you fix your price on? A. The price I give from $125 to $135 was for dairy cows. Q. Yes. Used for

a special purpose and chiefly valuable for that? A. Yes; that is what I was quoting on." There is no evidence that the cows in question were other than ordinary cows. There is no evidence of any value beyond the ordinary for breeding purposes, or for amount or quality of milk produced by them. Not only were the cows shipped admittedly "ordinary live stock", but they seem to come squarely within the meaning of that term as used in the contract of shipment. It defines "ordinary live stock" (so far as we are concerned) as follows: "Ordinary live stock means cattle . . . except such as are chiefly valuable for breeding, racing, show, or other special uses." And while the witnesses Rule and Zangle frankly said the market value given by them was based on their value as dairy cows, still can it be said that is a "special use" within the exception that would make them "other than ordinary live stock"? That is appellant's contention. The Standard Dictionary defines cattle as "Domesticated bovine animals, as oxen, cows, bulls and calves". The very common use of cows is producing milk and reproducing their kind, so we must conclude that ordinary cows are necessarily included in the term "ordinary live stock". There is no evidence in the record here that the cows in the shipment were of any particular value above the ordinary for either use, and in our opinion they did not fall within the exception, as their use for either milk production or breeding was not special within the meaning of such exception. The conductor of the train, a witness for the defendant, gave a very succinct statement of the appearance of the animals, which seems to be borne out by the admissions of the parties, as well as the evidence. He said: "They had the appearance of just common ordinary cattle." ▓ On the measure of damages the court instructed the jury as follows: "Where goods intrusted to a common carrier for shipment are injured through causes for which the carrier alone is responsible the owner of the goods is entitled to recover, as damages, the difference between the value of the goods at the time and place of delivery in an uninjured condition and their value in the depreciated condition in which they were delivered to the owner, if any." We see no error in the instruction given, or in the admission of the testimony of the witnesses Rule and Zangle.

The plaintiff himself, over the objection of defendant, testified that cows of the same type, grade, character and ages sold for $125 to $135 each, at *private sale,* at Hynes, during the months of January, February, and March, 1923. There is no question but what the measure of damages in such a case, unless limited by contract, is the depreciation of the market value of the animals at the time and place of delivery. (*Olcovich* v. *Grand Trunk Ry. Co.,* 179 Cal. 332 [176 Pac. 459].) And the testimony of the witnesses Rule and Zangle was in accord therewith, but value at "private sale" at the destination was an erroneous basis. But while the objection should have been sustained to the question asked plaintiff, his answer is in harmony with the other witnesses testifying as to market value, and the jury apparently did not adopt even the lowest figure given by him in arriving at their verdict, and as the substantial rights of the defendant do not seem to have been affected by the error it must be disregarded. (Sec. 475, Code Civ. Proc.)

Does the contract fix a limit of $50 per head to any damages sustained? Appellant contends that the figures and character "50/100" appearing under the heading "Shipper's declared value" fixes such a limit, and that applying that limit plaintiff's recovery could not exceed $189. Section 2176 of the Civil Code provides as follows: "A passenger, consignor, or consignee, by accepting a ticket, bill of lading, or written contract for carriage, with a knowledge of its terms, consents to the rate of hire, the time, place, and manner of delivery therein stated; . . . and also to the limitation stated therein to the carrier's liability for loss or injury to live animals carried. But his assent to any other modification of the contract obligations contained in such instrument can be manifested only by his signature to the same." It would seem that such a limitation may legally be made and particularly where the rate is fixed on the value stated. (*Donlon Bros.* v. *Southern Pac. Co.,* 151 Cal. 763 [12 Ann. Cas. 1118, 11 L. R. A. (N. S.) 811, 91 Pac. 603].) The contract here involved expressly provides that "on shipments of ordinary live stock no declaration of value shall be made by the shipper, nor shall any value be entered in this bill of lading". The shipment made falls in that class and apparently takes the basic rate per car, rates on

livestock chiefly valuable for breeding, racing, show purposes, or other special purposes, being based on actual values declared by the shipper. In the latter case there would be a reason for a shipper limiting the value in order to obtain a cheaper rate, which would not seem to apply in the case of a shipment of ordinary livestock. No evidence was introduced as to how the characters relied upon got into the contract, or to explain their meaning and we are asked to assume that they mean "$50 per head", as the shipper's declared value and that by their insertion into the contract of shipment it was intended to limit the carrier's liability for loss and injury of the animals to that amount per head. The rate not being fixed on value, as we have seen, it is hard to see, assuming that the characters mean what appellant claims, and further assuming that it was intended as a limitation of plaintiff's liability, where there could be any consideration for the agreement. Defendant suffered no detriment and apparently gave nothing, and certainly plaintiff received nothing, by having it in the contract. The fact that it is in writing would make a presumption of consideration ordinarily, but not against the showing on the face of the record that there was none, and in the face of uncertainty as to the meaning we could not presume nor do we see how the jury could find from the face of the contract that the plaintiff accepted the contract of carriage "with a knowledge of its terms" which would seem to be a necessary condition of his "assent" to the limitation (sec. 2176, Civ. Code).

In view of the foregoing we see no error in the action of the trial court in refusing certain instructions as to such alleged limitation of liability or in giving the ones it did relating thereto.

Many exceptions are noted both as to the introduction of evidence and the giving and refusing of instructions as well as the refusal of the court to grant a motion for nonsuit, but appellant has not seemed to rely on most of these, so it is sufficient to say that we do not see any prejudicial error therein.

Judgment affirmed.

Works, P. J., and Thompson (Ira. F.), J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal March 26, 1931, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 23, 1931.