[Civ. No. 3613.   Third Appellate District.—June 12, 1929.]

CRYSTAL ICE AND COLD STORAGE COMPANY (a Corporation), Respondent, v. RENSCHLER PRODUCE COMPANY et al., etc., Appellants.

Charles A. Bliss and A. R. Price for Appellants.

Butler, Van Dyke & Desmond for Respondent.

FINCH, P. J.—The plaintiff conducts a cold-storage warehouse in Sacramento. The Renschler Produce Company, referred to herein as the defendant, is engaged in the wholesale produce business in the same city. During October, November and December, 1925, and January, 1926, the defendant delivered to the plaintiff 4,825 boxes of apples to be kept in cold storage. Of these apples, 2,487 boxes were stored on a seasonal basis, to remain until the end of the following June, unless sooner withdrawn by the defendant, and the remainder thereof "were stored on a monthly basis, the contract for the storage of which was renewed at the end of each month in cases where the apples were not sold." The defendant withdrew apples from storage as early as December, 1925, and continued to make withdrawals at frequent intervals until some time in June, 1926, when the last of them were withdrawn, and during all that time the defendant made no complaint as to the condition of the apples when withdrawn or that they were in any manner damaged while in storage. The plaintiff sent the defendant monthly bills for storage charges and instructed its collectors to call on defendant and demand payment. On the defendant's continued failure to pay these bills, this action was commenced to recover the unpaid balance of $761.28. "Just before the suit was begun," the defendant presented a claim to the plaintiff, dated September 28, 1926, for $4,941.19 on account of alleged damages to the apples while in storage, and the defendant has filed a cross-complaint for that sum. The court found in favor of the plaintiff for the amount demanded in the complaint and against the defendant on the cross-complaint, and judgment

was entered accordingly. The defendant has appealed from the judgment.

The cross-complaint alleges that the plaintiff "carelessly and negligently and without exercising any care, . . . permitted and allowed the rooms wherein said apples were stored to become overheated and kept said rooms at a temperature of at least 11 degrees Fahrenheit too high for the safe preservation of said apples, causing said apples to become unmarketable as good fruit." This allegation is denied in the answer to the cross-complaint. While the appellant's argument is set forth under several headings, the only question raised by the appeal is whether the respondent maintained the proper temperature for the preservation of the appellant's apples. In appellant's opening brief it is said: "We submit that the findings that plaintiff and cross-defendant was not negligent in the care of defendant's fruit; and that defendant has not been damaged by the negligence or lack of ordinary care in the storage of defendant's apples, are not supported by the evidence."

The appellant correctly says that it was the plaintiff's duty "to use ordinary care in the maintenance of such temperature as would preserve the apples." (27 R. C. L. 991.) Whether the plaintiff performed this obligation must be determined by ascertaining what temperature was maintained and what temperature was required to preserve the fruit. Records of the temperature maintained, made at intervals of four hours, and continuous "automatic thermometer disc records" were introduced in evidence. It was stipulated at the trial that such records show the following:

The temperature in room 8, where the apples were on season storage, was maintained, during the greater portion of the time at 36 degrees Fahrenheit; but frequently the temperature was permitted to rise to 36½ degrees and 37 degrees for four, eight and twelve hour periods. October 22d and 23d it stood at 37 degrees for twelve hours, immediately followed by 40 degrees for four hours, 38 degrees for the next eight hours and then 39 degrees for eight hours; October 27th, at 39 degrees for eight hours; November 21st and 22d, at 37 degrees to 40 degrees for sixteen hours; March 15th and 16th, at 37 degrees to 38 degrees for forty-eight hours; April 5th and 6th, at 37 degrees to 38 degrees

for twenty-four hours; June 5th and 6th, at 37 degrees to 38 degrees for twenty hours; June 9th, at 38 degrees for twelve hours; June 18th, 37 degrees to $37\frac{1}{2}$ degrees for twenty-four hours; June 20th, 21st and 22d, at 36 degrees to $37\frac{1}{2}$ degrees for sixty hours. Temperatures ranging from 36 degrees to 37 degrees are omitted in this summary of the facts stated in the stipulation. The temperatures maintained in the monthly storage rooms do not vary greatly from those given.

The evidence shows without contradiction that the damage to the defendant's apples was due to a disease known as scald. Leavitt W. Renschler, one of the defendants, testified that scald "is not a disease, it is caused by refrigeration," that it "is the brown color that gets on the apples from the heat." The defendant, however, introduced in evidence "Farmers' Bulletin No. 1380," issued by the United States Department of Agriculture. It is therein stated: "Apple scald is a nonparasitic or physiological disease. It . . . is due to certain unfavorable conditions to which apples are sometimes subjected. Seasonal and orchard conditions are involved, as well as those that prevail in transportation, in storage, and on the market." Experiments at Wenatchee, Washington, showed that "apples from the heavily irrigated trees developed about three times as much scald after removal from storage as those from the lightly irrigated trees. . . . Low temperature is the best means of prolonging the life of the apple and is a most important agency in delaying the development of scald. . . . An increase of 9 degrees in the storage temperature has resulted in two to three times as much scald upon removal from storage on a particular date. It will be seen from two sets of data on the 1916 Grimes Golden that the effect of low temperature is that of delaying rather than preventing it, the disease being as serious at 32 degrees F. at the end of sixteen weeks as it was at 41 degrees F. at the end of twelve weeks. It is important that the apples be cooled as quickly as possible after picking. They should be delivered to the storage plant promptly, and the storage conditions should be such that there will be the least possible delay in bringing the fruit to the final storage temperature."

In "Department Bulletin No. 1406," also introduced in evidence by the defendant, it is said: "After being cooled,

apples from most sections of the United States should be held at 30 degrees to 32 degrees F. An exception should be made to apples grown in Pajaro Valley of California, since storage of this fruit at 35 degrees to 38 degrees is necessary to prevent one type of internal browning or breakdown.''

Most of the apples involved in this suit were grown at Hood River, Oregon, and the remainder at Yakima, Washington, and were shipped thence to Sacramento during the months of October, November and December, 1925. Most of them had been in cold storage for periods ranging from three weeks to three months prior to shipment, but at least one carload was shipped ''as received from the orchard.'' All of them were shipped in refrigerator-cars. It thus appears that the important early cooling of the apples immediately after picking was in the hands of persons other than the plaintiff.

Renschler testified that some of the Spitzenburg apples were withdrawn thirty days after they were placed in storage with the plaintiff in November, that ten to fifteen per cent of them showed scald; that the other apples showed scald, ranging from eight per cent in those first withdrawn to twenty-five per cent ''the latter part of the season''; and that he visited the storage plant ''three, four or five times a week, when we were taking them out of storage,'' but that during all that time he failed to call plaintiff's attention to the poor condition of the apples withdrawn.

While the foregoing evidence undoubtedly is sufficient to support a finding that the plaintiff did not exercise ordinary care in the storage of the defendant's apples, the important question is whether there is sufficient evidence to support the contrary finding made by the court. A. J. Nevis, who during the period of storage and for ten years prior thereto was plaintiff's foreman, in charge of the cold-storage plant, testified:

''We maintain a temperature in the warehouse for the cold storage of apples of 36 degrees; we have always found that is the correct temperature. . . . Q. And do you find that produces the best results? A. In Sacramento, yes. Very good results. Q. And you have never had any bad results? A. None whatever. Q. This is the first time this character of complaint has ever been presented to you or your company? A. To my knowledge, it is. . . . Q. Did

you examine the contents of the boxes? A. Open the boxes?
Q. Yes. A. No, we are not supposed to do that. . . . It
has been my experience that fruit would be affected with
a lower temperature; . . . that a temperature of 32 . . .
might be good for some apples, and not for others; apples
carrying a temperature at that degree are apt to contract
what we call internal browning, which is prevalent with
apples; apples carrying a much higher temperature, forty,
and forty-two, would be susceptible to scald; and we con-
sider a medium about thirty-six degrees about right. . . .
Q. What is the least temperature at which scalding occurs?
A. Scalding occurs around forty-two, forty-three or more.
Q. Does it at forty? A. I have never had it scald at that
temperature. . . . Q. Would it scald at forty-one? A. Pos-
sibly. Q. Now, if it would scald at forty-one, about how
long would it have to remain at forty-one? . . . A. It would
have to be—in my opinion the duration of the shortest—
two days possibly, where there could be any damage done.
. . . Q. Did you ever store apples for the Renschler Com-
pany? A. Ever since we have been in business except this
year. Q. And maintained the temperature the same? A.
Yes. . . . Q. Did you store any of the northwestern apples
so called any time prior to 1925–1926? A. Yes sir. Q. Did
you store any for Mr. Renschler? A. Yes, all his apples
were northwestern apples.''

The opinions relative to the cold storage of apples,
expressed in the bulletin introduced in evidence, indicate
that the temperature maintained in the plaintiff's plant was
too high to produce the best results in the preservation of
the defendant's apples, but the trial court was not required
to accept such opinions as against those of the foreman,
which were based upon ten years' practical experience in
the cold storage of apples in plaintiff's plant. The ap-
pellant suggests that the court should have taken judicial
notice ''that the high temperature was the cause of the
deterioration of defendant's apples.'' As said in *Brown* v.
*Piper*, 91 U. S. 37 [23 L. Ed. 200], ''the preservative effect
of cold, and especially of dry cold, is well known and ex-
emplified in the keeping of meat and fruit in icehouses,''
but no authority is cited to the effect that a court may take
judicial notice of the particular temperature which will best
preserve a particular variety of fruit.

The court found "that defendant withdrew apples from storage as early as December, 1925, and so continued to withdraw at frequent intervals until June, 1926," and "that he did nothing to prevent or minimize, such alleged damage." As stated, Renschler testified that the deterioration of his apples ranged from eight per cent in the first withdrawals to twenty-five per cent in the last. The defendant knew of this deterioration and remained silent, while the plaintiff was without knowledge thereof. In Farmers' Bulletin No. 1380, it is said:

"When scald begins to appear in commercial storage lots the dealer knows that the fruit can not safely be held for more favorable prices, and it is usually moved to market and sold for what it will bring."

"It is a recognized rule of law that in a case where injury or damage to a plaintiff's property is threatened as the result of a tort or breach of contract by another, the duty rests upon the plaintiff to use reasonable care and diligence to protect his property against such threatened loss or injury, and if he fails to do so he will not be permitted to charge the defendant for that portion of his loss or injury which was due to plaintiff's own neglect in this behalf." (*Vitagraph, Inc.*, v. *Liberty Theatres Co.*, 197 Cal. 694 [242 Pac. 709]; *Sargent* v. *North End Water Co.*, 190 Cal. 512 [213 Pac. 33]; 8 Cal. Jur. 782.)

The judgment is affirmed.

Plummer, J., and Thompson (R. L.), J., concurred.