[Civ. No. 1057. Fourth Appellate District.—September 6, 1933.]

WOODS LEASING COMPANY (a Corporation), Respondent, v. GLEN FUNCHEON et al., Appellants.

Herbert C. Kelley for Appellants.

Stearns, Luce & Forward for Respondent.

MARKS, Acting P. J.—In January, 1931, the plaintiff, Woods Leasing Company, instituted its action against Glen and Mary E. Funcheon to recover possession of the furniture and furnishings of the Aztec Court in the city of San Diego, or their value, together with damages for their detention. The action was founded upon its alleged ownership and right of possession of the personal property. The answer of the defendants denies the ownership and right of possession of the plaintiff and alleges right of possession in themselves under the terms of a chattel mortgage. They filed a cross-complaint seeking to foreclose the chattel mortgage, alleging an unpaid balance of $34,634.79 due upon a promissory note secured by this chattel mortgage. The trial court gave judgment for the plaintiff for the possession of the personal property, or, in case possession could not be had, its value in the sum of $1500, together with $1500 damages for its wrongful detention.

As we view the case it will finally turn upon the question of whether a finding of the trial court that the promissory note described in the cross-complaint had been fully paid, satisfied and discharged, is supported by the evidence. The facts presented by the record are so involved that they require more detailed recitation than in the ordinary case.

In June, 1927, the defendants built and furnished the Aztec Court on property which they owned in the city of San Diego. The total cost of the furnishings, purchased new, at that time was $6,013.83. They borrowed the sum of $17,500, which was secured by a first mortgage on the real estate. A year and a half later, in December, 1928, they sold the real and personal property to Neal D. and Edna R. Wagar, subject to the prior encumbrance, and as a part of the purchase price received a promissory note in the sum of $36,353.58, which was secured by a deed of trust on the realty, and a chattel mortgage on the furnishings. The chattel mortgage recited that it was given as "further security" for the payment of the note. Mr. and Mrs. Wagar entered into possession of the apartment court and seven months later, in July, 1929, sold the real and personal property to J. H. and Abbie R. Logeman. In the deed and bill of sale it was recited that the sale was subject to the encumbrances which we have mentioned, as well as certain other liens such as taxes and local improvement assessments. Mr. and Mrs. Logeman and their successors did not assume or agree to pay any of the encumbrances. The note, secured by the deed of trust and chattel mortgage, was by its terms made payable in installments. These installments were to be applied, first on the accrued interest, and, second, the balance on the principal. The last installment was paid in October, 1929. In December, 1929, there were delinquent installments on the promissory note secured by the deed of trust and chattel mortgage, interest on the promissory note secured by the first mortgage, taxes, local improvement assessments, and bills for water and electric light. The holder of the first encumbrance was pressing for payment of the delinquent interest, and the water and electric lights were about to be shut off because of the delinquency in these bills. Glen and Mary Funcheon, and A. D. Logeman, son and attorney-in-fact for J. H. and Abbie R. Logeman, had various conferences concerning the situation in Decem-

ber, 1929, which resulted in their entering into an escrow agreement whereby Mr. and Mrs. Logeman deposited a deed to the property to Glen and Mary Funcheon and agreed to pay all unpaid installments of interest, principal, taxes, local improvement assessments and other bills within sixty days and apply all income from the property on these items of indebtedness. If all such were paid it was agreed in the escrow instructions that the deed would be returned to Mr. and Mrs. Logeman, otherwise it would be delivered to the defendants. Mr. and Mrs. Logeman collected the rents from the premises and retained them. They made no payments on any of the items mentioned. The defendants were compelled to pay $900 interest on the promissory note for $17,500, and to make other payments in an amount not disclosed for water, electric lights and taxes. About the middle of January, 1930, the Logemans entered into negotiations with George W. Wood, the president and manager of the Woods Leasing Company, for a sale of the property. This resulted in Mr. and Mrs. Logeman executing a deed to the real estate to Lewin A. Wood, and a bill of sale to the personal property to George W. Wood, who also received a lease on the Aztec Court executed by Mr. and Mrs. Logeman, for both of which they received $500. George W. Wood and Lewin A. Wood, who were brothers, immediately conveyed to the Woods Leasing Company, which took possession of the Aztec Court. The defendants, Glen and Mary Funcheon, learned that A. D. Logeman, who was operating the property for his parents, had vacated it and they took possession of the court and the personal property here in question. Thereupon the Woods Leasing Company served a notice upon the defendants that it had acquired title to the real estate and the personal property and demanded that possession be delivered to it. This was refused.

On February 9, 1930, the deed from Mr. and Mrs. Logeman was delivered by the escrow-holder to Glen and Mary Funcheon and recorded. This was subsequent to the recordation of the deed from Mr. and Mrs. Logeman to George W. Wood and his deed to the plaintiff. All of the conveyances and bills of sale from Mr. and Mrs. Wagar to Mr. and Mrs. Logeman, Mr. and Mrs. Logeman to George W. Wood and Lewin A. Wood, and from George W. Wood and Lewin A. Wood to the Woods Leasing Company, recited that they

were made subject to the mortgage, deed of trust, and chattel mortgage which we have mentioned.

It appears that at a date not disclosed someone, probably either Mr. and Mrs. Wagar or Mr. and Mrs. Logeman, had placed a third encumbrance in the form of a deed of trust on the property to secure a promissory note in the sum of $1,000. This encumbrance was foreclosed and the property conveyed to Helen Clemmons by trustee's deed on May 26, 1930. Helen Clemmons deeded the property to Glen and Mary Funcheon on August 15, 1930. On the same date the defendants signed an "order for full reconveyance" directed to the Union Trust Company of San Diego, the trustee named in their deed of trust, requesting a reconveyance of the property to the party or parties entitled thereto. In this instrument it was recited "that said note, together with all other sums and indebtedness secured by said deed of trust has been fully paid and satisfied". The note was delivered to the trustee and marked canceled.

The chattel mortgage contained the following proviso: "It is also agreed, that if the mortgagors shall fail to make any payment as in the said promissory note provided, then the mortgagees may take possession of the, said property, using all necessary force so to do, and may immediately proceed to sell the same in the manner provided by law, and from the proceeds pay the whole amount in said note specified, and all costs of sale, including counsel fees not exceeding —— per cent, upon the amount due, paying the overplus to the said mortgagors; all of said costs, including said counsel fees, being hereby secured."

Uncontradicted evidence shows that no money was paid to the defendants other than the sum of $3,591.10, which was paid in installments on the principal and interest on the note to Glen and Mary Funcheon in 1929. Plaintiff contends that the recital in the order for reconveyance, signed by the defendants, to the effect that the note and indebtedness secured by the deed of trust had been paid and the conveyance by Mr. and Mrs. Logeman of the real property to the defendants, must be construed as a full payment of the principal and interest on the note, and that these facts and the inferences to be drawn from them support the finding of the trial court that the indebtedness secured by the chattel mortgage had been fully paid.

The only evidence offered by plaintiff, other than the written instructions, of the intent of Mr. and Mrs. Logeman and the defendants in entering into the escrow agreement of December, 1929, concerning the deed which was delivered to the defendants in February, 1930, is found in the following testimony of A. D. Logeman: "Q. Now, will you state the circumstances under which you placed this deed—executed these escrow instructions and placed the deed in escrow? A. Well, we were back on the payments to the court somewhat, and Mr. .Funcheon threatened to foreclose, and also threatened to tie up other property we had here. Q. That who had here? A. My father and mother. Q. Yes. A. And I thought it best to deposit the deed. He agreed to release me from all obligations if I would deposit the deed. Q. Now, who do you mean by 'we'? A. My father and mother and myself. Q. All right. He agreed to release your father and mother from all obligations if you deposited the deed? A. Yes, sir. Q. And that is why you deposited it? A. That is why I deposited it." In this connection it should be observed that the Logemans had assumed no obligation to pay the $17,500 first encumbrance, or the $36,353.58 second encumbrance, on the real property.

In the cross-complaint it was alleged that the only payments made upon the promissory note of Mr. and Mrs. Wagar were in the sum of $3,591.10, and it was sought to foreclose the chattel mortgage for a balance of $34,634.79. No credit was given for the value of the equity in the real property acquired by the defendants, Glen and Mary Funcheon, under the deed from Mr. and Mrs. Logeman, and of course credit should be given for the clear market value of this property thus conveyed. The only evidence of this value is contained in the testimony of Glen Funcheon. Placing a construction upon this most favorable to the Woods Leasing Company it would leave the clear market value of the property so conveyed in the sum of about $29,000, which would leave a balance of about $5,000 unpaid on the principal and interest then accrued on the promissory note secured by the chattel mortgage. This chattel mortgage was never released.

We have studied the record carefully and have concluded that the net result of the judgment rendered in this case

is to deprive Glen and Mary Funcheon of personal property for which they had not been paid and which originally cost them $6,013.83, besides mulcting them of $1500 for its use from the time they took possession in January, 1930, until the trial of the action.

The evidence clearly fails to support the finding of the trial court that the note for $36,353.58 has been paid unless the recital in the request for reconveyance signed by defendants on August 15, 1930, that it had been fully paid precluded them from proving the actual fact of partial and not complete payment.

It has been repeatedly held that the marking of a promissory note "paid" is not conclusive evidence of payment nor is a receipt in full conclusive that an account has been actually paid. The parties may prove the true facts. (*Gnarini* v. *Swiss American Bank*, 162 Cal. 181 [121 Pac. 726]; *Barling* v. *Weeks*, 4 Cal. App. 455 [88 Pac. 502]; *Breslauer* v. *McCormick-Saeltzer Co.*, 31 Cal. App. 284 [160 Pac. 251].) We cannot see why the same rule should not apply to the facts of this case, especially since the statement in the request for reconveyance, that the note had been paid, was made to the trustee merely for the purpose of securing a reconveyance of the property described in the deed of trust and clearing its title. Certainly the plaintiff and its predecessors in interest were not injured by this statement upon which they could not have relied as it was made long after their rights to or in the real and personal property, if any, had become fixed. Glen and Mary Funcheon should have the right to explain the true nature of the transaction.

Plaintiff urges that because of the extension of the sixty days given by the escrow instructions of December, 1929, to Mr. and Mrs. Logeman within which to pay the delinquent portions of their obligations, there was no default under the terms of the note and chattel mortgage, modified by this agreement, when defendants took possession of the personal property, and that such taking was therefore a conversion. The Logemans assumed certain obligations under the terms of this extension, if such it can be called, none of which they performed. One was to pay all the rents collected on the delinquent items of indebtedness. This they did not do. They collected the rents and kept

them. For a small consideration they conveyed all their interest in the real and personal property to third parties who had notice of all encumbrances, and vacated the premises, thereby evidencing an intention to repudiate and not to perform their part of the obligations. Mr. and Mrs. Logeman are not now attempting to assert any rights under the so-called extension agreement. They sold their interest in the real estate and furnishings but did not assign their rights under this agreement. Plaintiff is now attempting to take advantage of its terms without an assignment of the benefits or assumption of the obligations of this agreement to which it was not a party. There was no privity of contract between the Woods Leasing Company and Glen and Mary Funcheon, who did not take possession of the personal property from Mr. and Mrs. Logeman, but from a stranger to the agreement, the benefits of which the stranger now claims. The notice served by the Woods Leasing Company was merely a demand for possession and contained no offer on its part to perform the obligations of Mr. and Mrs. Logeman.

█ Under the facts of this case we cannot conclude that the defendants were required to wait the expiration of the sixty days before protecting their rights and taking possession of the mortgaged personal property under the default clause of the chattel mortgage.

█ Plaintiff next urges that, assuming the chattel mortgage to be in default at the time the defendants took possession, it only gave them the right to take possession so that they could *immediately* exhaust the security by a sale of the mortgaged property. From this it is argued that the delay in selling the chattels or foreclosing the mortgage amounted to a conversion and rendered their original taking of possession unlawful. Plaintiff relies principally upon the cases of *Blodgett* v. *Rheinschild*, 56 Cal. App. 728 [206 Pac. 674], *Peet* v. *People's Trust and Savings Bank*, 56 Cal. App. 46 [204 Pac. 413], and *Peet* v. *People's Trust and Savings Bank*, 90 Cal. App. 436 [266 Pac. 300], to support its theory.

The Blodgett case was an action for the possession of an automobile and damages for its detention. The defendant was the owner of the automobile and borrowed $400 from the plaintiff at an usurious rate of interest, giving what the parties termed a "lease" on the car to secure the loan.

The court held this instrument in effect a chattel mortgage. The plaintiff secured possession of the car and sold it to a third party without first acquiring title, which amounted to a conversion by him. The trial court found that the automobile was wrongfully taken from the possession of the defendant; that the plaintiff expended $138.12 in necessary repairs on the car while in his possession; that the value of the car was $550, and of its use $210; that the loan of $400 had not been repaid. Judgment was rendered giving defendant possession of the car upon his paying plaintiff the $400 loan, or if possession could not be had, the value of the car, $550, less the $400 loan and $210 for its detention less $138.12 expended by the plaintiff in repairs. This judgment was very properly affirmed on appeal as the original taking by the plaintiff was without right and his sale of the automobile before he acquired title was wrongful. It should be borne in mind that the trial court carefully balanced the accounts of the parties so that the plaintiff was given credit for the full amount of his loan, which was not done by the trial court in the instant case. We can find nothing in the Blodgett case necessary to its decision which supports the theory which the plaintiff is urging here.

The two opinions in *Peet* v. *People's Trust and Savings Bank, supra,* were in successive appeals in the same case. Peet was the owner of a band of cattle upon which the People's Trust and Savings Bank held a chattel mortgage securing a promissory note which became due on January 1, 1918. The bank took possession of the cattle on April 20, 1918, and after feeding at least some of them in California for a short time, removed the herd to Arizona, where they were turned out to graze. On October 7, 1918, the indebtedness to the bank was fully paid and thereafter it tendered part of the herd to Peet, some of the cattle having died, which tender was refused. Some time later the cattle were sold for $1600 by the bank or its successor. On February 4, 1919, Peet instituted his action for conversion of the cattle and finally recovered judgment for $3,000, which was affirmed. (90 Cal. App. 436 [266 Pac. 300].)

There is some discussion in the first opinion (56 Cal. App. 46 [204 Pac. 413]) of the effect of the failure of the bank to foreclose its lien for five and one-half months after it took possession of the mortgaged property and a

statement that the mortgagee should foreclose its lien within a reasonable time. This is unnecessary to the decision as it is clear that the bank's lien and right to possession terminated on October 7, 1918, with the payment of the indebtedness. There could be no possible justification for its subsequent sale of the cattle. However, we are not prepared to disagree with the rule that the mortgagee should proceed with the sale under one of the two methods provided by our law (*Ely* v. *Williams*, 6 Cal. App. 455 [92 Pac. 393]) within a reasonable time after taking possession of the mortgaged property as it would seem unjust to permit him to hold possession of the mortgaged property for an indefinite period as such action might cause prejudice to the mortgagor or his successor in interest. What is a reasonable time cannot be generally defined and must depend on the circumstances of each case. Where there was no prejudice to the mortgagor caused by the delay, a period within the statute of limitations might not be held unreasonable. ■ In the absence of authority so holding we do not care to declare the extreme rule that mere delay, without proof of injury, to the mortgagor or his successors, for a time within the statute of limitations, would work a forfeiture of the mortgage lien and amount to a conversion of the property. A fairer rule would permit the mortgagor or his successors to prove any damage caused by an unreasonable delay and offset it against the debt, rendering judgment for the overplus should there be one.

■ The judgment must be reversed because the finding that the note secured by the chattel mortgage is paid is not supported by any evidence, but is contrary to the meager evidence on this subject in the record. On a retrial of the cause the court should determine the clear market value of the interest in the real estate conveyed by Mr. and Mrs. Logeman to the defendants and credit the amount of this value on the chattel mortgage note. The other questions presented should be determined upon the evidence taken in accordance with the views here expressed.

■ We cannot agree with the contention of defendants that the sale of the mortgaged property from Mr. and Mrs. Wagar to Mr. and Mrs. Logeman was rendered void by the failure to give the written notice required by section 538 of the Penal Code. The defendants were orally informed

of the sale shortly after it occurred and recognized Mr. and Mrs. Logeman as purchasers and accepted payments from them for several months. Assuming, but not holding, that the sale might have been void because of the lack of the written notice, the defendants knew of the sale, treated it as valid, accepted money from the vendees and should not now be heard to question its legality.

Judgment reversed.

Jennings, J., concurred.

Barnard, P. J., being absent, did not participate therein.