[Civ. No. 13377.   First Dist., Div. One.   Sept. 8, 1947.]

SCOTT'S VALLEY FRUIT EXCHANGE (a Nonprofit Cooperative Association), Plaintiff and Respondent, v. GROWERS REFRIGERATION CO., INC. (a Corporation), Appellant; J. F. HUNT, Cross-defendant and Respondent.

438

Clarence E. Todd, Henry C. Todd and Gordon W. Malla-tratt for Appellant.

Dreher, McCarthy & Erickson for Respondents.

PETERS, P. J.—Plaintiff is a nonprofit cooperative, its membership being engaged in raising pears in Lake County. Defendant is a corporation operating in San Francisco a public warehouse for the storage of food and food products, including fruit. This action was brought by plaintiff to recover damages for the alleged conversion by defendant of 1,816 lugs of pears stored by plaintiff in defendant's refrigeration warehouse. Judgment for plaintiff was given in the amount of $6,560.30, the damages being calculated on the basis of $4.25 per lug, less the normal 15 per cent sales commission. Defendant, in addition to its answer, in which it denied the conversion, and, as affirmative defenses, pleaded noncompliance by plaintiff with various provisions of a form of warehouse receipt on occasion used by the warehouse, also filed a cross-complaint against plaintiff and one J. F. Hunt, a commission merchant who had negotiated the contract of bailment for plaintiff, in which defendant prayed for $2,500 damages, the amount allegedly spent by defendant in sorting and selling a portion of the pears. The cross-complaint alleges that the salvaged pears were sold for $419.71. Judgment went for the cross-defendants on the cross-complaint. Defendant appeals from both portions of the judgment.

On this appeal the main contentions of defendant are that the "entire" contract of bailment, including the warehouse receipt, negates its liability for the loss, or practical loss of the pears; that the effect of the judgment is to place upon it an excessive standard of care; that plaintiff failed to pursue its duty to minimize damages; that the effect of the judgment is to extend preferential rates to the plaintiff con-

trary to the public utilities law; and that the findings relating to demand and refusal are not supported.

Although none of the pleadings raises negligence as an issue, an examination of the record demonstrates that the case was tried, decided, and briefed on the theory, subject to the defenses mentioned, that if the pears had been substantially destroyed by defendant's negligence and were not practically salvageable, the defendant was liable. This is mentioned, although not raised by either party, because of the conflict of authority in this state as to whether negligence alone will support a conversion action. There is authority to the effect that negligent injury or destruction of property does not constitute a conversion. (*Poggi* v. *Scott,* 167 Cal. 372 [139 P. 815, 51 L.R.A. N. S. 925]; *Emmert* v. *United Bank etc. Co.,* 14 Cal.App.2d 1 [57 P.2d 963]; *Rogers* v. *Huie,* 2 Cal. 571 [56 Am.Dec. 363]; *Cass* v. *Ocean Park Bath Co.,* 45 Cal.App. 656 [188 P. 616]; *Woods Leasing Co* v. *Funcheon,* 134 Cal.App. 111 [25 P.2d 47]; see, also, *Zaslow* v. *Kroenert,* 29 Cal.2d 541 [176 P.2d 1]; Restatement of Torts, § 224.) There is also substantial authority, however, in which destruction of property resulting from negligence was held to constitute a conversion. (*Dieterle* v. *Bekin,* 143 Cal. 683 [77 P. 664]; *Atwood* v. *Southern California Ice Co.,* 63 Cal. App. 343 [218 P. 283]; *Vagim* v. *Haslett Warehouse Co.,* 131 Cal.App. 197 [20 P.2d 992]; *Wolfe* v. *Willard H. George, Inc.,* 110 Cal.App. 532 [294 P. 436]; *Wilson* v. *Crown Transfer etc. Co.,* 201 Cal. 701 [258 P. 596]; *First Nat. Bank* v. *Crown T. & S. Co.,* 89 Cal.App. 243 [264 P. 534].) All of the cases recognize that an action will lie against a bailee for negligent destruction of or injury to deposited goods, but many of the cases holding that negligence does not constitute a conversion point out that the measure of damages for conversion and negligence is frequently different, and that for negligence the plaintiff should be limited to the damages customarily allowed in such actions, and not permitted to recover the greater damages sometimes allowed in conversion actions. That problem is not here involved, because the court measured the damages by the market value of the pears on the date of the destruction, the normal negligence measure of damages. In view of the facts that throughout the trial the plaintiff attempted to show, without objection, that defendant was negligent, and that defendant devoted the major

part of his defense to attempting to negate such negligence, that the trial court decided the case on the theory of negligence, that defendant does not raise the point under discussion in its briefs, and that the measure of damages allowed was that customarily allowed in negligence actions, it is quite apparent that the cause has been tried and briefed on the theory that negligence was involved, and that the parties are barred from now changing that theory. The point is mentioned only for the purpose of calling attention to the apparently conflicting cases in this state, and to indicate, in any later proceedings on this appeal, that the point was not inadvertently overlooked by this court.

█ The theory upon which the case was decided, and the basic finding of the trial court, is disclosed by finding XIII which reads as follows: "That the defendant from and after the date of deposit of the said pears in storage by the plaintiff and cross-defendant had so negligently and carelessly operated and maintained the storage rooms of its said warehouse in which the said pears were stored as to cause or permit the said pears on or before September 13, 1943, to become destroyed to the extent of seventy-five per cent (75%) and each lug thereof to become decayed by reason of wet breakdown following scald in excess of ten per cent (10%), and that under the terms and provisions of Section[s] 784, 804 and 831 of the Agricultural Code of the State of California, the plaintiff and cross-defendant could not legally thereafter accept delivery of the said pears or any part thereof or transport or sell the same before they had been sorted and repacked on the premises of the said warehouse pursuant to proper licenses therefor obtained from the State Department of Agriculture and that the cost and expense of such sorting and repacking would be and was greatly in excess of the reasonable market value of the repacked pears legally saleable after such sorting and repacking."

Sections 784 and 831 of the Agricultural Code referred to in the finding make it a criminal offense to transport or to sell any fruit unless the fruit and the containers conform to the provisions of the code. Section 804, also referred to in the finding, reads in part as follows: "Fresh pears shall be mature but not overripe, free from codlin moth larvae, mold, decay, black end, unsealed cuts, and skin breaks; and free from serious damage. . . . Not more than 10 per cent, by count, of the pears in any one container or bulk lot may be below

these requirements, but not to exceed one-half of this tolerance shall be allowed for any one cause."

An examination of the record demonstrates that the above finding is amply supported by substantial evidence, in fact, defendant in its reply brief frankly concedes that it "does not now contest the right of the trial Court to find from the evidence that defendant was guilty of *some* negligence which negligence resulted in *some* damage to the pears." (Reply Br., p. 2.) In view of this concession that the finding of negligent damage is supported (defendant does challenge the finding as to the extent of the damage), but brief reference need be made to the supporting evidence. The record shows that in June, 1943, plaintiff requested Hunt, a San Francisco commission merchant with whom plaintiff had dealt for many years, to find some refrigeration space in San Francisco for plaintiff's pears. Hunt communicated with defendant and defendant promised to hold storage space in August for about 5,000 lugs. Although there is a conflict in the evidence, the court found, and the finding is supported, that defendant knew Hunt was acting as agent for plaintiff, and defendant knew, although when the pears were delivered it issued its receipts in the name of Hunt, that plaintiff was in fact the owner. Between August 6, 1943, and September 8, 1943, plaintiff shipped to defendant for storage 5,300 lugs of pears. All of these pears were "the cream of the crop." Some 4,500 lugs were U. S. grade No. 1, and the balance a combination of U. S. grades No. 1 and No. 2. They were the first harvested fruit, and such fruit holds up best for storage. It was the common practice, well known to the trade, to keep such pears in storage for 90 to 120 days for the purpose of selling them to the winter trade. Under proper storage conditions pears of this type would keep perfectly for such a period of time. Each lug had been inspected prior to shipment and each box contained on the outside a marking clearly indicating the grade as determined by a federal-state Department of Agriculture inspector.

Defendant received these pears and stored them in two separate rooms, designated as the "small" and "large" rooms. The 1,816 lugs involved in this action were stored in the "small" room. Although there is some conflict, there is substantial evidence that the proper temperature for the storage of pears is 32 degrees, or less. There is substantial evidence that on certain days the temperature in the small room was

actually 37 degrees or more, and there is expert evidence that such a temperature is too high. Defendant's manager admitted a temperature of between 33 and 35 degrees, and also admitted that on two occasions prior to September 13th his refrigeration machinery broke down and that during the repairs thereto the temperature may have risen as much as 4 degrees. Admittedly, defendant kept no log of temperatures, although that is the common and usual practice in most fruit refrigeration storage plants.

There is ample and substantial evidence to show that pears in storage should be so piled as to permit a free circulation of cool air around the lugs, and that the pears in the "small" room were improperly piled. The evidence most favorable to plaintiff is to the effect that the lugs were "cross-piled" without "stripping," and piled solid, end to end, so that air could not possibly circulate.

There is evidence that the manager and president of defendant stated to several witnesses that prior to September 13th the machinery had broken down and was out of order for three days. While the manager denied these conversations, he did admit that in August one of his two compressors was being repaired and was out of commission for 10 hours, and that the other was being repaired and was out of commission for a shorter period, early in September. Both compressors were necessary to maintain the proper temperatures. Defendant had no "stand-by" equipment in case of emergency, although it was the custom and practice of public refrigeration plants to have sufficient machinery to maintain a 25 per cent safety factor in excess of everyday needs. Although the repair company that repaired defendant's machinery maintained a monthly inspection service, defendant did not avail itself of this protection, calling the repair company only when its machinery was out of repair.

The pears in the "large" room were properly piled and did not spoil, but the pears in the "small" room began to ripen as early as Friday, September 10th. The manager of defendant testified that he observed the pears on that Friday and "found that they were turning very fast and that we had to move them." They were riper on September 11th. He testified that he tried to get in touch with Hunt late Friday afternoon and again on Saturday, but that he was informed Hunt was out of town and would not return until Monday, September 13th. He made no attempt to notify

plaintiff of the condition then existing. Early Monday morning, September 13th, he notified Hunt of the condition of the pears, and Hunt notified the manager of the plaintiff. The manager of plaintiff, and several of plaintiff's officers, immediately left Lakeport for San Francisco, and, upon arrival, together with Hunt, they visited defendant's plant and inspected the pears. The trial court has found that on that date the pears in the "small" room were 75 per cent spoiled. That finding is amply supported. The manager of plaintiff testified that his inspection disclosed that "about 1500 boxes were completely spoiled, cooked," that "some boxes were fully decayed; most boxes were 75 per cent decayed. The others were so ripe they could not be handled—they should not have handled them at all." In his opinion not more than 15 per cent of the pears could have been salvaged if resorted at once.

The federal-state fruit inspector testified that he examined the fruit in the "small" room on September 13th and 14th. In addition to testifying as to the improper piling of the boxes, and that the manager of the defendant was then attempting to sort out the good pears, he testified that the pears "were in bad shape and I found them unusable for human consumption. . . . Unfit for human consumption. . . . They were practically all scalded . . . a disease in the storage of fruit caused by fruit being chilled and then the temperature rising." His official report shows that the "scald ranges from 10 per cent to 100 per cent, averaging approximately 75 per cent for entire lot . . . averaging approximately 55 per cent wet breakdown following scald." He testified that none of the pears could be sold as edible without resorting, and that, if immediately resorted, not more than 25 per cent could have been salvaged. He subsequently inspected other pears of plaintiff in other San Francisco storage houses and found such pears in excellent condition.

Hunt testified that he inspected the pears in the "small" room on September 13th; that "we started to inspect the pears, started raising covers where we could—all we could see were chocolate colored pears, juice running out of the boxes"; that on the top rows they were 100 per cent bad, that "to me it appeared as a hopeless mess . . . that from my observation on that day I don't think there would be any salvage"; that the cost of salvage would not be commercially feasible.

There was other evidence that on September 13th the pears were "hog feed, a lot of slop . . . they might be sold to a hog outfit. That is all they were good for." Another witness testified that the fruit was rotten and that juice was running out of the bottom of many boxes and that the pears were at least 75 per cent bad, and the balance not very good.

The plaintiff's witnesses testified that on the 13th and thereafter no instructions were given by them as to the disposal of the pears, and that defendant made no demand or request that the pears be removed. On September 16th plaintiff's manager told defendant's manager that "I don't care what you do with them. . . . They are your pears." Defendant did attempt to salvage some of the pears. Its verified cross-complaint alleges that it salvaged some of the pears at a cost of $2,500 and received for such salvaged pears $419.71. There was some evidence that defendant actually received a little less than $1,000 in salvage. There was no detailed evidence of the actual cost of salvage, although the evidence demonstrates that such cost was material and probably in excess of what could be or was received for the salvaged pears. Most of the pears in the "small" room were sold for hog feed. All of the salvaged pears were sold by defendant through commission merchants upon the order and for the account of defendant.

It is, of course, the law that a warehouseman is not an insurer, but is liable only for a failure to exercise ordinary care. (*England* v. *Lyon Fireproof Storage Co.*, 94 Cal.App. 562 [271 P. 532]; *Runkle* v. *Southern Pacific Milling Co.*, 184 Cal. 714 [195 P. 398, 16 A.L.R. 275]; see cases collected 25 Cal.Jur., p. 957, § 15.) Where a warehouseman undertakes to store fruit he is bound to maintain his storage rooms at such a temperature as is proper for preserving such fruit. (*Crystal Ice etc. Co.* v. *Renschler P. Co.*, 99 Cal.App. 417 [278 P. 874].) Tested by these standards it is quite obvious that negligence was clearly shown. From this brief résumé of the evidence it is quite apparent that the finding that defendant was negligent and that such negligence proximately injured the pears in the amount set forth in the finding is amply supported.

One of the major contentions of defendant is that the "entire" contract between it and plaintiff negated its liability for the spoilage of the pears. This contention is based on the following facts: With every deposit of a load of pears defen-

dant delivered to Hunt a so-called "hand receipt," and Hunt passed it on to plaintiff. This receipt merely recited the date of delivery, the lot number, and the number of the lugs delivered. Printed on this receipt was the following: "Customer in accepting this receipt agrees to rules of our standard warehouse receipt and is bound thereby." Plaintiff's manager knew this provision was on the receipts received by him, but he had no knowledge of the terms of the warehouse receipt. Defendant's manager testified that his firm had a "standard" form of warehouse receipt that was delivered to customers upon request. Admittedly, however, defendant did not deliver a copy of this warehouse receipt to Hunt or to plaintiff, and both testified they had no knowledge of the terms of such warehouse receipt. The evidence shows that but very few of these warehouse receipts were issued to depositors. From December, 1943, to May, 1946 (the time of trial), defendant issued but six of its formal warehouse receipts, one of which was void, and since the defendant started in business it has issued but 407 such receipts.

The so-called "standard" warehouse receipt was introduced into evidence. It provides, *inter alia*, that defendant was not liable for any injury to the goods in excess of $25 unless the true value of the property was stated in the receipt, and that no liability should attach unless a claim in writing was presented within 30 days of the termination of the bailment. It was further provided that in case of accident to the plant or machinery of defendant, or for any other reason, the defendant could terminate the bailment upon 48 hours' notice. Another provision was to the effect that the defendant was not liable for the preservation of any goods in closed packages unless it examined the goods when taken in storage at the request and expense of the bailee.

■ The trial court found that Hunt had not been given a copy of the warehouse receipt; that neither Hunt nor plaintiff had been told that the rates for the storage were on any basis other than the full value of the pears deposited; that it was the general custom of the defendant to issue only the "hand receipt" to its customers, and that it was not its custom to issue a formal warehouse receipt; that the "formal warehouse receipt was not during the said periods usually or customarily issued by defendant"; that the formal receipt introduced into evidence was not the "standard" receipt of defendant and was not similar to that employed by other

public warehousemen in San Francisco; that defendant knew that neither Hunt nor plaintiff had ever seen a copy of the warehouse receipt; that defendant knew that both Hunt and plaintiff believed that the rate charged for the storage was based on the full value of the pears; that defendant never notified Hunt or plaintiff to remove the pears, and that the first notice plaintiff had of the destruction of the pears was on September 13, 1943.

These findings are substantially supported. Both Hunt and the manager of plaintiff testified that defendant had never notified them to remove the pears, or otherwise attempt to terminate the bailment. While it is true that the pears were stored in closed lugs, the top cover was easily removable, and each lug, on the outside, contained the official inspection stamp designating the type and quality of the pears. The manager of defendant had been in the fruit business for many years, was familiar with the nature of fruit, and generally knew the market value of the pears at the time they were stored. He was also familiar with what the various grades of pears designated by the inspector's stamp indicated. Defendant makes no contention that the storage charges assessed by it and paid by Hunt were anything less than it would have charged had the "true value" of the pears been expressly declared. The "true value" of the pears was in fact declared by the inspector's stamp designating the grade just as clearly as if the parties had then designated the market value of the pears on the date of delivery.

█ It is, of course, the law that the parties may incorporate by reference into their contract the terms of some other document. (*Forest Lawn M. P. Assn.* v. *DeJarnette,* 79 Cal.App. 601 [250 P. 581]; see cases collected 12 Am.Jur. p. 781, § 246.) But each case must turn on its facts. (*William A. Davis Co.* v. *Bertrand Seed Co.,* 94 Cal.App. 281 [271 P. 123].) For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties.

In *Los Angeles Inv. Co.* v. *Home Sav. Bank,* 180 Cal. 601 [182 P. 293, 5 A.L.R. 1193], the bank's passbook delivered to the depositor contained certain printed matter purporting to limit materially the bank's liability that would otherwise

exist for paying out the depositor's money on forged endorsements. In holding that this printed provision appearing in the very document evidencing the contract was not binding on the depositor the Supreme Court stated (p. 613):

"This statement is not signed by the plaintiff, nor is there any showing that it was called to the plaintiff's attention or wittingly agreed to by it. It is just the character of thing that the average man would not trouble to read, or reading would fail to appreciate the significance of the inclusion in it of 'indorsements,' and the fact that it very materially changed the usual obligation of a bank to its depositors. There is no reason, so far as we know, why a depositor may not make such an agreement if he deliberately chooses to do so, unreasonable as it is. But it is evident that the statement comes in the category of 'traps for the unwary,' and before such statement can be given effect as a contract binding upon the depositor and changing in a substantial particular the relation which presumably he thought he was entering into, it must appear affirmatively that he consented and agreed to it either by being required to sign it or by having his attention particularly called to it. It is not sufficient merely that it appear in the front of the pass-book. . . .

"In order for the bank to avail itself of the statement as a contract made by the plaintiff, it was necessary for the bank to prove that the statement had been called to the attention of some responsible officer of the company. Without this it cannot be fairly said that it was accepted or consented to by the company, and nothing of this sort appears.

"We are not unaware of the numerous authorities holding that a rule or regulation printed in a savings bank pass-book accepted by the depositor is binding upon him. Practically all, if not all, of these cases, however, are cases wherein either the circumstances were such that the consent of the depositor to the by-law reasonably appeared, or the bank was a mutual one, the members of which were the depositors who as members were bound by the bank's rules. In practically all of them also the rule involved was a reasonable and customary one, which presumably the depositor would be aware of as an ordinary incident of the relation of savings depositor and bank."

In *McQueen* v. *Tyler*, 61 Cal.App.2d 263 [142 P.2d 466], this court recently considered the effect of a printed provision of a freight bill constituting the contract of the parties ex-

pressly limiting liability of the carrier. We there held that, under the circumstances of the case, the shipper was not bound by the terms of the receipt, he not having read it, even though he signed it.

If it be the law, as these cases and others that might be cited indicate, that a person is not always bound by provisions limiting liability of one of the contracting parties printed on the very document constituting the contract of the parties, it is quite apparent that a person is not necessarily bound by the terms of a separate document purporting to limit materially the liability of the other contracting party where the evidence shows that the first party did not know of the terms of the incorporated document, that his attention was not directed to the incorporated document, and where the evidence shows that he did not assent thereto. If a trial court is justified in holding that a provision in a passbook printed in the front thereto constitutes a "trap for the unwary," as was held in the Home Savings Bank case, *supra*, the trial court in the instant case was much more justified in holding that plaintiff was not bound by the terms of the warehouse receipt where no copy of the receipt was furnished to plaintiff, and where its officers did not know its terms, and where no attempt was made to call the attention of Hunt or of plaintiff's officers to its terms. If defendant had desired to act fairly with its depositors it could have easily furnished each depositor with the form warehouse receipt instead of the hand receipt. Thus, even if plaintiff failed to comply strictly with the precise terms of the warehouse receipt (and, on this point we are rather of the opinion that in view of defendant's actual knowledge of the true value of the fruit the failure to state the true value in the hand receipt and the failure to request an inspection were excused and did not violate the terms of the warehouse receipt), we think that the trial court was fully justified in holding that under the facts here existing the terms of the warehouse receipt were not binding on plaintiff.

It is next urged that the effect of the judgment here under review is to grant to plaintiff a preference over other depositors in violation of section 19 of the Public Utilities Act (Stats. 1915, p. 115; 2 Deering's Gen. Laws, Act 6386) prohibiting a public utility from granting preferences. This argument is necessarily grounded upon the assumption that all of the terms of the warehouse receipt are binding on plaintiff. In addition to the fact that there is no evidence that plain-

tiff was in fact granted a preferential rate, the argument under consideration necessarily falls with the holding that the trial court was justified in finding that the terms of the warehouse receipt were not part of the contract of bailment.

■ Defendant points out that there is no evidentiary support for the finding that plaintiff made a demand for the pears on September 13, 1943. Plaintiff, on oral argument, conceded that the finding was unsupported. A demand is, of course, normally a condition precedent to the bringing of a conversion action. However, a demand is not always indispensable. In addition to the fact that the case was tried on the theory of negligent destruction of the pears, as already pointed out, the finding that they were 75 per cent destroyed and that each lug was more than 10 per cent defective is supported. This being so, it would have been unlawful, under the provisions of the Agricultural Code to which reference has already been made, to move the pears without resorting and repacking. Under such circumstances a demand was unnecessary. The law does not require useless and futile acts. It would have been futile to have demanded that defendant do something the law forbade. Under such circumstances a demand was unnecessary. (See *Mier* v. *Southern California Ice Co.*, 56 Cal.App. 512 [206 P. 83].)

■ The last major contention of defendant is that plaintiff failed to observe its duty to minimize damages. While it is no doubt true that the pears were not a total loss on September 13th, and while it is no doubt the law that an injured party is under a duty to minimize damages if he can reasonably do so, under the facts here involved that rule has no application. It apparently is defendant's theory that some material salvage could have been accomplished had the pears been removed on September 13th. While defendant's witnesses testified that some of the pears could have been sold on September 13th without resorting and repacking, and that it sold some of the pears on September 16th, and thereafter, without repacking, the witnesses for plaintiff, particularly the state inspector, testified that none of the pears in the "small" room could have been sold legally on September 13th without resorting and repacking. The verified cross-complaint of defendant alleges that the pears sold by it on September 16th and thereafter brought in $419.71 and that it expended the sum of $2,500 in its "efforts to minimize damages." Thus, it would appear that the expenses incident to the resale were

disproportionate to what could be realized on such sale. The evidence shows that defendant probably realized on such sales somewhat more than it pleaded. It failed to introduce detailed evidence of the cost of such salvage activities, but the evidence indicated that the cost of salvage was probably more than could be recovered. While more pears could have been salvaged on September 13th than were available three days later, it is a reasonable inference from the evidence that the cost of salvaging the few pears available for salvage would have exceeded the amount recovered. This being so, plaintiff's duty "to minimize damages" did not extend to the necessity of spending so much to realize so little. Had plaintiff attempted to salvage the pears it is reasonable to infer that such operation would have enhanced rather than minimized the damages.

The duty to minimize damages is predicated upon the statutory rule that a person is required to use reasonable care to prevent an unwarranted piling up of damages. The extent of the duty is to use ordinary care and diligence to prevent the enhancement of damages, and the duty does not extend to the necessity of going to extraordinary or unusual lengths to minimize damages. (*Jegen* v. *Berger*, 77 Cal. App.2d 1 [174 P.2d 489] ; *Baker* v. *Borello*, 136 Cal. 160 [68 P. 591] ; *Ash* v. *Soo Sing Lung*, 177 Cal. 356 [170 P. 843].) Under the circumstances the plaintiff was under no duty to attempt to salvage the few good pears available for salvage.

The judgment appealed from is affirmed.

Bray, J., and Ogden, J. pro tem., concurred.