The Texas New Orleans Railroad Company sues Miller Company, Incorporated, for the balance of freight charges alleged to be due on two shipments as follows:
(1) eight bales of compressed cotton marked Arah, which under bill of lading dated September 20th, 1932, was transported to East Orange, N.J., consigned to Miller Company, Incorporated; and
(2) one hundred bales of compressed cotton marked Arik, which under bill of lading dated October 5th, 1932, was transported to Little Falls, N.Y., consigned to Miller Company, Incorporated.
The carrier avers that the shipments were transported to their respective destinations; that the correct freight charge on the shipment of 8 bales was $25.19, whereas only $13.89 was collected; that the correct charge on the 100 bales was $295.86, whereas only $151.79 was collected, and that therefore on the two shipments there is a balance due of $155.38. (It is obvious that an error of 1¢ has been made, and that the amount prayed for should have been $155.37).
J.J. Miller, individually, appeared and made answer, averring that the corporation, Miller Company, Incorporated, which had been responsible for the two shipments, had been dissolved, and that he, J.J. Miller, had assumed all liability of the said corporation to which he has succeeded. He admitted that the two shipments had been made as alleged, and that the amount set forth as having been paid, had been paid, but he denied that the freight charges had been improperly figured, declaring that he had no knowledge as to the correct respective rates, and calling upon the carrier for strict proof of such rates.
Miller averred that the 8 bales of cotton had been bought by the Miller corporation from Manget Brothers, a partnership, under a contract by which the said Manget Brothers assumed responsibility for all freight charges required for the transportation of that cotton to East Orange, N.J., and, averring that he had succeeded to all of the assets of the said Miller Company, and calling upon the said partnership in warranty, Miller prayed for judgment in such amount as he might be condemned to pay to the carrier.
As to the shipment of 100 bales, Miller averred that this cotton likewise had been purchased from Manget Bros. We now quote from Miller's answer:
"That by an oral understanding with Manget Bros. your respondent was to be entitled to inbound freight bills. That these freight bills would have permitted respondent to ship his cotton to their points of destination at a through rate, and that had such a through rate existed, the amounts which respondent paid, as alleged in the petition, would have been the full and complete payment to the carrier."
Miller further averred:
"That as now appears from the petition filed herein, the said through rate is not available, and that because thereof the cotton must move under a local rate, and that the difference between the through rate and the local rate amounts to $155.38, which is the amount demanded of respondent in the petition", and Miller further alleged: * * * "that he purchased the cotton above referred to under Manget Bros.' guaranty and warranty that the cotton would move under a through rate, the said Manget Bros. to furnish your respondent with good inbound freight bills.", and * * * "that should the plaintiff prevail in this suit, then and in that event the said Manget Bros. should be condemned to pay to your respondent any sum of money which your respondent may be condemned to pay to the plaintiff herein, as respondent had a contract *West Page 764 
with Manget Bros. guaranteeing to respondent that the cotton referred to in the petition filed herein would move under a through rate."
Manget Brothers now admit that they sold the 8 bales of cotton to the Miller Company, all freight charges to final destination to be paid by them, and they concede that if the carrier is correct as to the rate on this shipment, then they are responsible to the Miller Company for such additional sum as it, the said Company, may be responsible for but they do not admit the correctness of the rate, nor that Miller, individually, may claim from them even though they may be obligated to the Miller Company.
As to the other cotton, the 100 bale shipment, Manget Brothers deny that the rate contended for by the carrier is correct, and concerning the call in warranty, they deny that they sold that cotton to the Miller Company and they deny any liability to the Miller Company or to Miller under any alleged guarantee, or because of any oral contract to furnish paid freight bills as alleged by Miller.
There was judgment as prayed for in favor of plaintiff against Miller, and there was also judgment on the call in warranty in favor of Miller and against Manget Brothers.
Miller has not appealed.
Manget Brothers have appealed from that part of the judgment which runs against them as warrantors. By this appeal they have kept alive their right to contend, not only that they should not be held as warrantors, but also that, although as between the plaintiff carrier and Miller, the principal judgment is final, as between themselves and Miller the principal judgment is erroneous. Where, as here, there is a judgment against the main or original defendant, and also in favor of that defendant and against a warrantor, there are in effect two judgments, and unless both are correct, the judgment in warranty is incorrect. The warrantor, therefore, as between himself and the principal defendant, may be heard to question the correctness of both parts of the judgment.
By his appeal, a warrantor may not reverse the principal judgment, but he may, by showing on his appeal that there should have been no judgment against the defendant, obtain a reversal of the judgment in warranty. This, of course, is not true where a warrantor, called upon by the principal defendant to defend the principal suit, undertakes that defense, for there the warrantor, having undertaken to defend for the principal defendant must appeal from the judgment on the main demand, or be foreclosed by it. Code of Practice art. 384; Anderson v. Cade, 10 La. 269. For a discussion of the effect of an appeal by a warrantor from the judgment in warranty alone, see Southern Development Co. v. Dubroca, 109 La. 990, 34 So. 50. Manget Brothers then, by their appeal from the judgment in warranty, have kept alive their right to contend that there should have been no judgment against Miller, and have kept alive also their right to contend that even if the judgment against Miller is correct, still the judgment in warranty is erroneous. We therefore first investigate the evidence concerning rates, because unless the rates contended for by the carrier are correct, the judgment in warranty against Manget Brothers must be reversed however final the judgment against Miller, by his failure to appeal, may have become.
The carrier elicited from Mr. Gooch, the Chief Rate Clerk, testimony to the effect that the charges contended for by it were correct, and there was no testimony in contradiction. It appears, however, that this testimony was based on an expert witness's examination of published tariffs issued by the carrier and approved by the Interstate Commerce Commission, and not on his own independent knowledge of these rates. We think that no objection could be made to this evidence on this court. It is evident that no tariff or rate expert can testify to such matters as rates, except upon consultation of approved and published tariffs, and it was for this reason that the Congress included in the Interstate Commerce Act the provision that tariffs approved by and filed with the Interstate Commerce Commission should be received as prima facie evidence, 49 U.S.C.A. sec. 16, par. (13). Counsel, however, in oral argument, and in brief, have pointed out that the said traffic expert and rate clerk did not testify that the tariffs which were referred to were the ones which were in effect when the shipments were made, and it is true that there is nothing in the record to show that they were. Counsel argue that this is a fatal omission and that without proof that the tariffs introduced were effective on the dates of the respective shipments, there is no proof as to the correctness of the rates sued for. However, we do not find that any objection was made on that point, and it appears very obvious that *West Page 765 
the failure to state that the tariffs used were the ones in force when the shipments were made, resulted from oversight since the witness was placed on the stand for the very purpose of identifying those tariffs as the ones which were effective at those times.
The witness was questioned concerning the shipment of 8 bales to East Orange, N.J., and concerning the shipment of 100 bales to Little Falls, N.Y., and he consulted these tariffs, one of which had become effective on October 6th, 1931, and the other of which had become effective on February 19th, 1932. He then testified that the rates contended for by the carrier were correct. It is plain that his failure to add that those tariffs issued prior to the making of those shipments had remained in effect until the shipments had been made, resulted from oversight alone, and that it would work an unnecessary delay to remand the matter for that proof. Furthermore, we think that the introduction of those tariffs showing that they had become effective prior to the dates on which these shipments were made, raises the presumption that they were still in effect and placed upon the defendants the burden of showing that those tariffs had expired or had been cancelled.
Therefore the rates sued for were, we think, shown to be correct by the applicable tariffs from which the witness testified. Since Manget Brothers now admit that they sold the 8 bale shipment to the Miller Company, and agreed to be responsible for the freight charges to East Orange, N.J., they would have been responsible to the Miller Company for such amount as that company might have had to pay to the carrier had that Company been the plaintiff in warranty. Therefore, as to that shipment, the only remaining question is whether Miller, individually, may assert the right which the Miller Company could have asserted against Manget Brothers had the Company continued to function.
We see no force in the contention that whatever may have been the obligation of Manget Brothers in favor of the Miller Company, there is no such obligation in favor of Miller, individually. Miller testified that he has "succeeded" to Miller Company; that he is "conducting" the business which was formerly conducted by the corporation, and that he has "assumed all of the debts of the corporation." And there was introduced in evidence a certified copy of a notarial act of sale by which Miller, on October 31st, 1935, bought all of the assets of Miller Company, Incorporated. We conclude that so far as the undercharge on the 8 bale shipment is concerned, Manget Brothers were properly held liable in warranty to Miller.
We find most complicated the facts on which Miller bases his contention that Manget Brothers are responsible for the balance of freight charges, if any such balance is due on the 100 bale shipment to Little Falls, N.Y., and it is very obvious that Miller's charge that this cotton had been sold to the Miller Company by Manget Brothers is not correct as was conceded during the trial. It is shown that several weeks before the Miller Company caused the 100 bales to be shipped, that company bought from Manget Brothers 230 bales of cotton, and that the 100 bale shipment involved here was not a part of that 230 bale purchase, and was not bought from Manget Brothers at all, but from Jovite Cau and Company, an entirely different concern. Miller admitted this at the trial, and in doing so altered entirely the theory on which was based his claim in warranty against Manget Brothers, for whereas, in his call in warranty he charged that he had purchased the cotton from Manget Brothers and on Manget Brothers' "guarantee and warranty that the cotton would move under a through rate" he now claims that though Manget Brothers did not sell him that cotton, they had, in connection with the previous sale of 230 bales, orally agreed to furnish him with certain freight receipts which he, or rather the Miller Company, might use to obtain a through rate on the 100 bales later bought from Jovite Cau and Company.
It is shown that at that time the carriers had established and were permitting a "transit" or concentration privilege under which cotton buyers at concentration points might use the freight receipts already received on cotton which had moved from interior points to concentration points in obtaining a lower through rate on cotton shipped from the concentration points to mill cities or other points to which the cotton might be ultimately transported. This privilege, as the record shows, was availed of in the following manner: Let us assume that Manget Brothers in New Orleans has purchased cotton from a local point in Texas, and has paid the freight charges from that local point to New Orleans, and later has sold that cotton to a mill in New York, under an agreement obligating Manget Brothers to pay the freight charges from New *West Page 766 
Orleans to New York. In most instances there is a lower through rate than the rate which results from totalling the local rates which would be involved. In other words the rate from the interior Texas point direct to New York is usually lower than the sum of the two rates, one from the Texas point of origin to New Orleans, and the other from New Orleans to destination.
Under the transit or concentration privilege, Manget Brothers in shipping the cotton to New York, by presenting the freight receipts showing that they had paid the freight charges from the Texas points, might obtain the through rate from the Texas point to New York and then, on the freight charge based on that through rate, obtain credit for the amount paid on the first movement from Texas to New Orleans.
The record further shows that this transit or concentration privilege permitted the substitution of cotton and that therefore a cotton merchant or concentrator in New Orleans might, in making the second shipment out of New Orleans, substitute cotton other than that covered by the inbound freight receipts. The record also indicates without definitely showing it, that, in order to take advantage of this right to substitute, the shipper must substitute for the original cotton, other cotton which has come into the concentration point from the same interior point of origin.
We have described this transit privilege as the record shows that it operated between the cotton merchants in concentration points and the carriers. Now let us see the effect of it as among cotton merchants. Because of this transit privilege, cotton merchants in New Orleans retain inbound freight receipts, and when they sell cotton to other merchants, as the result of another well established trade custom in the cotton business, furnish with each bale sold a freight receipt, showing payment of inbound freight on a bale of cotton, not necessarily the same bale, from point of origin to New Orleans, so that should the purchaser ship this bale out of New Orleans, he may, if the said freight receipt proves to be usable in connection with the bale shipped out, obtain a lower rate than he would otherwise have to pay.
Now let us revert to the facts of this case. When Manget Brothers sold 230 bales to the Miller Company several weeks before the 100 bales were purchased by the Miller Company from Jovite Cau and Company, Manget Brothers, as a result of the trade custom, became obligated to furnish to the Miller Company freight receipts showing payment of the inbound freight charges on 230 bales of cotton from point of origin to New Orleans. Apparently the Miller Company at that time had no need for those receipts. So it was verbally agreed that the Miller Company would be entitled to demand of Manget Brothers 230 receipts whenever in the future it might decide to use them. When it bought the 100 bales from Jovite Cau and Company, and sold them to a purchaser in Little Falls, N.Y., under an agreement obligating it, the Miller Company, for the freight charges from New Orleans, it requested Manget Brothers to furnish inbound freight receipts covering 100 bales, and, of course, Manget Brothers did not know what cotton the Miller Company intended to ship. The record leaves no room for doubt, even Miller admitting it, that when a merchant in New Orleans sells cotton to another, the custom which we have described does not require that the freight receipts delivered therewith should be usable in connection with any particular cotton, all that is required being that the receipts furnished be usable if the transferee should possess and should desire to ship cotton which originated at the point from which the cotton shown on those receipts came. This feature of the custom appears to us to be rather strange, but that it was a part of the custom is shown by the record and is plainly indicated by the testimony of Miller, himself.
It is indicated by the record that in order that the transit privilege be availed of, the shipper of the outbound cotton must be the consignee who paid the freight on the inbound movement. Apparently because of this requirement, when the Miller Company decided to ship to Little Falls, N.Y., the 100 bales purchased from Jovite Cau and Company, it requested Manget Brothers to produce 100 of the 230 freight credits due under the sale of 230 bales, and also requested Manget Brothers to ship the 100 bales in their name. Manget Brothers agreed to do this and allocated to the Miller Company 100 freight receipts which it had obtained in connection with 100 bales of cotton which had come to New Orleans from Texas City, Texas. The shipment was made to Little Falls, N Y, the through rate was paid and all *West Page 767 
seemed serene until several years later when the carrier demanded the additional amount claimed in this suit, declaring that the 100 bales had not originated at Texas City, Texas, but at Oklahoma interior points; and that therefore since the freight credits covered cotton which had moved from Texas City to New Orleans, the through rate had been improperly allowed on the cotton from New Orleans to Little Falls, which had originated in Oklahoma.
Again reverting to the question of whether the carrier is correct in refusing to allow the through rate on this 100 bale shipment, we note that counsel for Manget Brothers maintain that the carrier is wrong in refusing the through rate on the ground that the tariffs do not show a through rate from Oklahoma points to New York. Counsel contend that the rate experts show that there was such a through rate shown in the tariffs. We cannot tell from the record whether the undercharge resulted from the fact that there was not in effect a through rate from Oklahoma points to Little Falls, N.Y., or from the fact that substitution under the transit privilege is limited to cotton from the same point of origin. If either was the reason then the carrier seems to be correct in demanding the additional amount because we are of the opinion that the evidence shows first that if substitution is to be made, the substituted cotton must have originated at the point from which the original cotton came, and also that the record shows that there was no through rate from Oklahoma points to New York. Counsel's belief that the record shows that there was a through rate from Oklahoma points to New York seems to result from the fact that the rate expert did, it is true, refer to a through rate between these points, but he explained that that through rate was arrived at by summing up the local rates.
Thus the controversy between Miller and Manget Brothers is limited to a very narrow question, Was Manget Brothers obligated to deliver to the Miller Company 100 freight receipts which might be used against the particular 100 bale shipment which the Miller Company desired to make, or was the full obligation of Manget Brothers complied with when it delivered freight receipts which had value if the Miller Company could find for shipment cotton with which those receipts might be used?
That the custom did not require that the receipts be good in connection with any cotton which the Miller Company might select is very evident, and as we have said Miller, himself admits this. Note his testimony on this point:
"Q. And the practice was to deliver freight bills where inland cotton was purchased, was it not? A. Yes, expense bills.
"Q. And the particular expense bills ordinarily were left entirely to the vendor, were they not? A. Well, it could be that way.
"Q. Don't you know that was the practice? A. No. I don't know that.
"Q. Don't you know that the seller ordinarily delivered the least available expense bills that he had in the files? A. Sometimes, that's correct.
"Q. And that was the practice, was it not? A. I wouldn't say that, but it has happened.
"Q. And that is recognized as being permissible in the trade? A. Well, yes, I imagine it is permissible.
"Q. So that being the fact, a seller had the right to take any expense bills he had in his file and deliver them to the purchaser in satisfaction of what you say was the custom of delivering expense bills? A. They are supposed to deliver good expense bills that have some value, but what the value is, that is determined by the final movement of the cotton.
"Q. In other words, they didn't guarantee that you could use these particular bills in connection with a movement to East Orange when they delivered these bills to you in connection with the sale of the 230 bales, did they? A. They guaranteed me expense bills that were good. As it turned out, they were no good and weren't usable anywhere."
Miller's statement that the particular expense bills which Manget Brothers furnished "were no good and weren't usable anywhere" is shown to have been incorrect. The record convinces us that those bills had value and could have been used had Miller, or rather the Miller Company, desired to ship out of New Orleans cotton which had originated at Texas City, Texas. Furthermore, when counsel for Manget *West Page 768 
Brothers endeavored to show that these bills had value, in connection with this particular cotton, to the extent of drayage charges at 12 1/2¢ each, that evidence was excluded, the trial judge being of the opinion that Manget Brothers had warranted that those particular bills were usable as part payment of the through freight rate on that particular cotton. This ruling was incorrect since, as we have shown, the only warranty which resulted from the custom did not go so far as to include an agreement that those bills would be usable under all circumstances and in connection with any cotton regardless of its origin.
The only remaining point sought to be made by Miller is that in addition to the verbal warranty resulting from the trade custom, there was here a written guarantee given by Manget Brothers that these expense bills might be used in connection with this particular cotton. This point is founded on a document prepared and executed by Manget Brothers and tendered to the carrier in connection with the shipment of the 100 bales from New Orleans to Little Falls. This document, addressed to the carrier, listed 100 bales of cotton which had come to New Orleans from Texas City, Texas, and stated that the freight receipts shown were usable in connection with the shipments of the cotton to Little Falls, N Y, and at first reading it appears to bind Manget Brothers to the warranty that those freight receipts would be usable in connection with that shipment to Little Falls. But we must not overlook the substitution feature of the transit privilege. Under that feature, all parties knew that the Miller Company might substitute any other cotton which had come to New Orleans from Texas City, Texas, and so far as the record shows, Manget Brothers had no knowledge whatever that the cotton which the Miller Company desired to ship had come from Oklahoma points. As we have said, they knew nothing at all about that cotton. All that Manget Brothers guaranteed was that those freight receipts were good in connection with Texas City cotton, and they would have been good had the Miller Company shipped Texas City cotton. It did not do so, it shipped Oklahoma cotton. This was not the fault of Manget Brothers. When called on for 100 freight receipts, they produced them and that was all that the custom required them to do. So far as the 100 bale shipment is concerned, Manget Brothers have fully complied with the warranty placed upon them by the trade custom. There is no further obligation on their part.
The judgment on the call in warranty is amended by the reduction of the amount thereof to $11.30, with legal interest from judicial demand, defendants and plaintiffs in warranty to pay the costs of appeal, Manget Brothers to pay the costs resulting from the call in warranty in the First City Court.
Judgment amended and affirmed.