[Civ. No. 12539.   First Dist., Div. One.   Nov. 2, 1943.]

H. H. McQUEEN et al., Respondents, v. EVERETT A. TYLER, Appellant.

W. Cloyd Snyder, Louis T. Fletcher and Snyder & Fletcher for Appellant.

W. M. Conley, Philip Conley, Matthew Conley and Conley, Conley & Conley for Respondents.

KNIGHT, J.—A jury returned a verdict for the sum of $5,500 in favor of plaintiffs McQueen and against the defend-

ant Everett A. Tyler individually and doing business under the name of Oneonta Transfer & Storage, in an action to recover damages for the loss of household goods. From the judgment entered on said verdict the defendant Tyler appeals.

The circumstances attending the loss of the goods and which gave rise to the litigation are these: The plaintiff H. H. McQueen, an engineer employed by the Shell Oil Company, was ordered transferred from Tracy to South Pasadena, and his employer made arrangements with the company operated by the defendant, which was licensed as a common carrier by the state Railroad Commission, to transport plaintiffs' household goods to Pasadena. Accordingly on November 5, 1941, a moving van, operated by Lloyd Tyler and Willis Crossley, arrived at Tracy from Pasadena, and after having spent most of the day loading plaintiffs' goods into the van, started back for Pasadena. En route, about midnight, at a point a few miles south of Madera, a collision occurred between the van and a produce truck owned by R. T. Ito Co. and driven by one Jack Ault. As the result of the collision the drivers of both trucks, Ault and Tyler, were killed; Crossley was severely injured; both trucks caught fire and burned, and all of plaintiffs' household goods were completely destroyed by the fire. Two suits arose out of the collision. One was brought by the appellant Tyler against Ito for damages for loss of equipment, and the other was brought by the McQueens against appellant and Ito for the loss of their goods, which they alleged were of the value of $7,077.28. In the latter action the appellant Tyler filed a cross complaint against Ito to offset any judgment the McQueens might obtain against him, and in his answer to plaintiffs' complaint he set up as a special defense a "freight bill," claiming that by reason thereof the carrier's liability for loss of goods was limited to 10c per pound per article lost. Appellant claimed, therefore, that the highest value that could be recovered for the loss of the goods was $1,000. The action brought by the McQueens against appellant and Ito, and the one brought by appellant against Ito, were consolidated for trial, and the action brought by the McQueens was submitted to the jury on two general and two special verdicts. On the issues raised by the McQueens' complaint and the answers thereto the jury returned a general verdict in favor of the McQueens and against appellant and Ito separately for the sum of $5,500; and on the issues raised by the cross-complaint and the answer

thereto the jury returned a general verdict in favor of Tyler and against Ito for the sum of $5,500. The two special verdicts were submitted at the request of appellant Tyler. The first was as follows: "Was Lloyd Tyler, the driver of the Oneonta Transfer and Storage Vehicle at the time of the accident in question, guilty of negligence which was the proximate cause of the said accident?" The jury's answer thereto was "No." The second special verdict was in the following form: "Did the provisions in the freight bill in evidence here, purporting to limit the carriers liability for loss to plaintiff's goods to 10c per pound per article, constitute a contract between the parties, limiting such liability and entered into fairly between the parties?" and the jury's answer thereto was "No." Ito filed notice of appeal from the judgments against him, but took no steps to perfect the appeals, so that the only appeal now before this court is the one taken by Tyler from the judgment for $5,500 entered against him and in favor of the McQueens on the general verdict; and the sole issue presented by the appeal is whether there is evidence to support the conclusions reached by the jury on the second special verdict. If there is, such verdict in itself supports the general verdict and the judgment entered thereon. In other words, according to the jury's finding on the second special verdict the freight bill referred to therein did not constitute the contract between the parties and was not fairly entered into by them; therefore the limitation of liability specified therein was not controlling and the McQueens were entitled to recover the reasonable value of the goods, which the evidence clearly shows and the jury found was no less than $5,500.

An examination of the "freight bill" referred to in the special verdict shows that it has none of the characteristics of a bill of lading or similar instrument. It consists of a paper about a foot square, the middle one-third portion of which is made out in the form of a workman's time sheet to be filled in by the employee, and down in the lower third portion is a space wherein was written a general description of the goods to be transported. The upper third of the document contains the names and addresses of the consignor and consignee; and immediately below the name of the consignor, in extremely small print, is a provision reading as follows: "You are hereby authorized to move, ship, or store the goods referred to below from the above Consignor's address. The

shipper's agreed or declared value of the shipments transported hereunder is hereby specifically stated by the shipper to be not exceeding 10c per lb., per article." The "10c" was inserted in a blank space in pencil, and opposite the provision appears McQueen's signature. He admitted having signed the document, but he claimed that he did so at Crossley's request and in reliance upon the representation made by Crossley that it was "an authorization to take the goods"; that he did not read the document, and had no knowledge of its contents, and would not have signed had he known it contained the limitation provision. The uncontradicted testimony given at the trial fully substantiates such claim. Briefly stated it was as follows: Appellant's employees, Crossley and Tyler, having driven all night, arrived at the McQueens early on the morning of the day set for the moving, and as stated all that day they were engaged in packing the goods and placing them in a large, enclosed van. Nothing had been said to McQueen by anybody at any time about any contract of carriage or the signing of any document. After dusk the McQueens were ready to leave in their car with their two children, and McQueen told Crossley they were leaving. Crossley then said that before McQueen left he had something for him to sign and he handed McQueen the paper. It was then too dark for McQueen to read the paper, and he asked Crossley what it was, to which Crossley replied, "An authorization to take the goods"; whereupon, relying on Crossley's representation that such was the nature of the document and without reading the paper or knowing its contents, he signed it, putting it up against the door jamb on the porch to do so. Crossley then took the paper, leaving no copy thereof with the McQueens, and they had no knowledge of the provision therein purporting to limit the liability of the carrier until long after the destruction of their goods. During the week following the accident the carrier's representative asked the McQueens to submit a claim containing an inventory showing the full value of their goods, and not even then was the purported contract limiting liability called to their attention. It is true that the rate specified for the transportation of the goods was less than it would have been if there had been no limitation of liability. But McQueen did not even know what rate had been specified; and at the trial McQueen testified positively that he would not have signed the paper if he had been aware of the provision therein limiting the liability for loss of the goods.

Section 2176 of the Civil Code provides in part that a consignor or consignee by accepting a written contract for carriage "with a knowledge of its terms" assents to the rate of hire and also to the limitation stated therein upon the amount of the carrier's liability in case property carried in packages, trunks or boxes is lost or injured, when the value of such property is not named; but his assent to any other modification of the carrier's obligations contained in such instrument can be manifested only by his signature to the same. Section 1565 of the Civil Code provides that the consent of the parties to a contract must be free, mutual and communicated by each to the other; and section 1567 declares that an apparent consent is not real or free when obtained through fraud or mistake. And in this connection it is held that while a contract made between a shipper and the carrier may, under proper circumstances, limit liability, such a contract must not only be reasonable, but must be freely and fairly made between the parties (*Donlon Bros.* v. *Southern Pacific Co.*, 151 Cal. 763 [91 P. 603, 12 Ann.Cas. 1118, 11 L.R.A.N.S. 811]); also that a carrier who defends an action for loss of goods, alleging a special contract limiting liability, must show that the shipper accepted the contract " 'with a knowledge of its terms' which would seem to be a necessary condition of his 'assent' to the limitation." (*Murray* v. *Southern Pacific Co.*, 112 Cal.App. 150 [296 P. 667].)

In the present case the questions of fact as to whether McQueen had knowledge of the terms of the special contract, and as to whether such contract was fairly and freely made and entered into, also as to whether the apparent consent of McQueen thereto was obtained through fraud or mistake and therefore not real and free, were all submitted to the determination of the jury under a set of instructions, the correctness of which appellant nowhere challenges; and it would seem to require no comment to demonstrate that the uncontradicted testimony above narrated is amply sufficient to sustain the jury's negative implied findings on all of those questions of fact.

Crossley was a witness at the trial, but did not deny the testimony given by McQueen as to the circumstances attending the signing of the paper; but appellant contends that Crossley's statement that the document was "an authorization to take the goods" was not a representation of fact, but a conclusion of law, and that in making the statement Cross-

ley had no intention of deceiving or defrauding McQueen; that McQueen was a man of superior education and intelligence, and should not have relied on Crossley's statement. The fact remains, however, that the statement was not a correct statement of the true nature of the document he asked McQueen to sign. Quite to the contrary, standing alone the statement was a positive misrepresentation of the contents of the document and was made as a definite answer to McQueen's inquiry as to what the document was; and McQueen signed his name under circumstances where he could not read the document and on the full strength and reliance of the representation made by Crossley as to what the document contained.

Nor does the fact that the contract limiting the carrier's liability was required by the rules and regulations of the Railroad Commission and was in the exact form prescribed by such rules, take the case out of the operation of the code sections hereinabove referred to and make the contract binding on McQueen, in view of the uncontradicted evidence and the jury's finding thereon that McQueen's assent to the contract was not fairly obtained. Furthermore, the rules of said commission require a higher rate to be charged where the valuation of the property is placed by the shipper at more than 10c per pound per article, and it does not appear that plaintiffs would not have been willing to pay whatever rate would have been necessary to carry the property at its true valuation. On the contrary, the evidence positively shows that McQueen would not have signed the freight bill if he had been aware of the purported limitation of value contained therein.

In further support of the trial court's judgment plaintiffs contend that in no event was appellant entitled to rely on the special defense of a contract limiting liability for the reason that it was nowhere alleged therein that the freight bill was signed by McQueen upon any special consideration; that is, that it was not alleged therein that any reduction in freight rates was accorded by the carrier as an inducement for, or by reason of, the signature to the alleged contract; hence that no issue thereon was properly tendered. In urging this point plaintiffs rely on the case of *Reeder* v. *Wells Fargo & Co.*, 14 Cal.App. 790 [113 P. 342]. However, in view of the conclusion reached on the controlling factual issue presented by the appeal, it is unnecessary to inquire into this additional point. Nor do the remaining points urged by ap-

pellant require special attention, for the reason that they are merely incidental to the main issue presented by the appeal, and in our opinion are without merit.

The judgment is affirmed.

Peters, P. J., and Ward, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 27, 1943.