[Civ. No. 14524. Second Dist., Div. Three. Apr. 14, 1945.]

GEORGE GARDNER, as Trustee in Bankruptcy, etc., Respondent, v. RICH MANUFACTURING COMPANY, LTD. (a Corporation), Appellant.

[Civ. No. 14525. Second Dist., Div. Three. Apr. 14, 1945.]

WILLIAM I. HEFFRON, as Trustee in Bankruptcy, etc., Respondent, v. RICH MANUFACTURING COMPANY, LTD. (a Corporation), Appellant.

George W. Manierre and G. M. Cuthbertson for Appellant.

Ernest W. Pitney for Respondents.

FOX, J. pro tem.—Defendant appeals from a judgment in favor of plaintiff Gardner, as trustee in bankruptcy of the estate of James E. Smith, a bankrupt. Defendant also appeals from a judgment in favor of plaintiff Heffron, as trustee in bankruptcy of the estate of Betty Boyd Krug, a bankrupt. Plaintiffs' assignors, the bankrupts, had been engaged in business as licensed highway contract carriers under the Highway Carriers' Act (Stats. 1935, chap. 223; Deering's Gen. Laws, Act 5129a) transporting property for compensation by motor vehicle over the public highways of the state. As such highway contract carriers plaintiffs' assignors had transported for defendant certain shipments of cast iron pipe and fittings. The theory of both complaints is that plaintiffs' assignors charged and collected freight charges less than the minimum rates prescribed by the California Railroad Commission for such services. Plaintiffs therefore seek to recover the difference between the legally prescribed rate and the rate paid by the defendant pursuant to a purported contract with said carriers.

The Gardner case is based upon the Railroad Commission's decision and order No. 29313, effective February 5, 1937, and orders supplementary thereto, in case No. 4088, part "C" and the schedules of minimum rates therein established and prescribed, together with the rules and regulations governing the same. The second cause of action in the Heffron case is based upon the same decision and order. The first cause of action, however, in the Heffron case is based on the Railroad Commission's decision and order No. 28761, effective June 1, 1936, in case No. 4088, part "A." The third cause of action in the Heffron case is based on said commission's decision and order No. 30370, effective April 1, 1938, in said case No. 4088, parts "U" and "V." Each of the complaints also has a cause of action in the form of a common count for the reasonable value of the transportation services alleged to have been rendered to the defendant.

The purpose of the Highway Carriers' Act is, among other things, to establish just and reasonable rates for the transportation of property by motor vehicle over the public highways of the state and to prevent discrimination among shippers of this class. To this end the act confers jurisdiction on the Railroad Commission to hold hearings and establish and prescribe schedules for minimum rates for contract high-

way carriers, and to make rules and regulations governing the same. It was pursuant to this authority that the Railroad Commission rendered the decisions and promulgated the orders hereinbefore referred to establishing and fixing schedules of minimum rates, rules and regulations upon which these actions are based. The schedule of minimum rates thereby established and prescribed and the rules and regulations governing the same become a part of every contract between a highway contract carrier and the shipper. (*Pittsburgh, C. C. & St. L. R. Co.* v. *Fink* (1919), 250 U.S. 577 [40 S.Ct. 27, 63 L.Ed. 1151]; *Johnston* v. *L. B. Hartz Stores* (1938), 202 Minn. 132 [277 N.W. 414].) The tariff applicable, on the facts, to any particular shipment cannot be changed by an agreement between the parties (*New York Cent. & H. R. R. Co.* v. *York & Whitney Co.* (1921), 256 U.S. 406 [41 S.Ct. 509, 65 L.Ed. 1016]), and the carrier or its assignee is entitled to collect the proper rate. (13 C.J.S. § 393, pp. 873-75; see, also, note, 83 A.L.R. 245 et seq., and cases there cited.) Otherwise, the statute would be ineffectual for the purpose for which it was enacted. The defendant, however, contends that the superior court had no jurisdiction to render the judgments herein on the ground that exclusive primary jurisdiction to determine controversies concerning the interpretation and application of rates, orders, decisions, rules and regulations of the Railroad Commission has been fixed by law in said commission, and plaintiffs were required to seek and to exhaust the administrative remedy with that commission before applying to the courts. In making this argument defendant misconceives the nature of these actions. They are simply actions to recover a stated amount of money—the difference between the amount paid under the contract between the carriers and the shipper and that due under the rates fixed by the railroad commission in the aforesaid decisions and orders. The court was called upon to determine what rate the Railroad Commission had established for a particular commodity transported by motor vehicle in a given territory in specified quantities. It was then simply a question of the application of these rates to the facts as disclosed by the evidence. No question of fixing rates or rules and regulations was in any way involved. That had already been determined by the Railroad Commission in its decisions and orders. There is, therefore, no reason why the superior

court should not have jurisdiction of these cases for the effect of the judgments, if properly rendered, is to enforce the rates already established by the Railroad Commission.

In *California Adj. Co.* v. *Atchison, T. & S. F. R. Co.* (1918), 179 Cal. 140 [175 P. 682, 13 A.L.R. 274], the shipper claimed reparations for deviation from the long and short haul clause of the state Constitution. It was there argued, as it is here, that the superior court had no jurisdiction of the action— that jurisdiction was with the Railroad Commission in the first instance and not with the courts. This contention, however, was not sustained. In passing on it the court pointed out that "When a charge has been paid to a carrier, or a demand exacted in violation of the long and short haul clause of the Constitution, there is nothing which can call for the action of the Railroad Commission. As the transaction fixes conclusively the liability of the carrier, the transaction itself furnishes the measure of damage which the shipper suffered as soon as it occurred, and the commission could neither decrease nor enlarge it." (P. 145.) That principle by analogy applies to the instant cases. Defendant points out, however, that section 71(d) of the Public Utilities Act [Stats. 1915, p. 115, as amended; Deering's Gen. Laws, Act 6386] provides that complaints for the collection of lawful tariff charges of public utilities may be filed in any court of competent jurisdiction and that the Highway Carriers' Act does not contain such a provision. The right of a highway contract carrier to collect undercharges in the absence of a provision in the statutes authorizing the filing of an action therefor was directly presented in the case of *Johnston* v. *L. B. Hartz Stores, supra*. The Minnesota Supreme Court held the action to recover the undercharges could be maintained. In passing on the point the court had this to say: "There is no specific provision in Chap. 170 that a carrier may recover such an undercharge, but we are asked to imply that right from the language of Sec. 7 and the general purpose of the act as announced by the legislature.

"Under the Interstate Commerce Act, common carriers are permitted to recover undercharges, although the language of that act is not quite so strong as is section 8 of chapter 170, and although there is no specific provision for the recovery of undercharges. See paragraph 7 of section 6 of chapter 1 of title 49 U. S. C. A. p. 283. It is quite true that the purposes

underlying the regulation of common carriers are primarily the establishment of reasonable rates and the prevention of discrimination, but in order to effectuate such purposes it becomes necessary to render contracts for any other rate nugatory and to treat the contract for carriage as one for the established rate and permit a recovery for an undercharge. Obviously, the permitting of such a recovery is a much more effective way of enforcing the law than any other could possibly be. The same is true of the contract carrier act. Fines and penalties might be imposed, but the pressure of the shippers upon the carriers for reduced rates in violation of the statute will almost entirely be relieved if the shippers know that notwithstanding any illegal bargain that is made, recovery still may be had on the basis of the minimum rates fixed by the commission. Collusion between the carrier and the shipper to circumvent the law, which would otherwise be easy of accomplishment, will be practically eliminated. All of these considerations apply with equal force to the maintenance of the contract carrier fixed rates by the commission." This reasoning, in our opinion, effectively answers defendant's argument on this point.

Defendant relies strongly on *Entremont* v. *Whitsell* (1939), 13 Cal.2d 290 [89 P.2d 392]; *Abelleira* v. *District Ct. of Appeal* (1941), 17 Cal.2d 280 [109 P.2d 942, 132 A.L.R. 715]; and *Texas & P. R. Co.* v. *Abilene Cotton Oil Co.* (1907), 204 U.S. 426 [27 S.Ct. 350, 51 L.Ed. 553]. In the Entremont case the question (apart from that of the constitutionality of the act) was whether the transaction there involved constituted the transportation of property for compensation over the public highways and was therefore within the purview of the Highway Carriers' Act or whether it was merely the leasing or renting of trucks within the meaning of certain sections of the Streets and Highways Code. The commission determined that the transaction came within the act. Consequently, the rate *previously* fixed for such service by the commission was automatically applied. No such problem is here presented. Obviously, the transactions involved in these cases come under the Highway Carriers' Act. The Abelleira case which involved an application of the rule that "where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act" has no application here.

There was nothing further for the Railroad Commission to do so far as the fixing of rates or their application was concerned. The decisions and orders of the commission had become final, subject, of course, to amendment and modification by the commission in accordance with the provisions of the act. These actions represent an effort through the courts to enforce in these particular instances the rates established by the commission. In the Texas & Pac. Ry. case the shipper sued the carrier in a state court to recover freight charges alleged to be in excess of a reasonable rate. The case clearly has no application here for in that case there was involved a question of determining whether or not the charges were in excess of a reasonable rate. The determination of what was a reasonable rate would be a matter of fixing rates and the court had no jurisdiction to determine that question. It would have to be determined by the rate fixing authority before the court would have any jurisdiction. In the instant cases the rates, as we have said, had already been fixed.

██ Defendant's next point is that the court committed error in permitting the plaintiffs' witness Faus to give "Opinion Evidence as to the law of the Forum." There is no merit in this point. The decisions and orders of the Railroad Commission which fixed the rates, rules and regulations under which the several shipments were made were introduced in evidence. These were part of the legal foundation of plaintiffs' cases. Mr. Faus qualified as an expert auditor in rate matters. He explained to the court what particular decisions, orders and rates he used in making up the exhibits attached to plaintiffs' complaints. This was entirely permissible. In *Texas & N. O. R. Co.* v. *Miller & Co.* (1941), (La.App.) 4 So.2d 762, which was an action by the carrier to recover the balance of freight charges alleged to be due on certain shipments, the carrier's chief rate clerk was permitted to testify to the effect that the charges contended for by it were correct. This testimony was based on the witness' examination of published tariffs and not on his own independent knowledge of these rates.

██ Defendant also contends that the court unduly restricted its cross-examination of witness Faus as to his qualifications as an expert. The witness had stated his experience in this field when he initially took the witness stand. No ob-

jection was then raised by the defendant to his qualifications as an expert in rate auditing matters. Nor did defendant ask permission of the court to inquire further into his qualifications at that time. After the witness had testified on direct at length, counsel for defendant, on cross-examination, then sought to go into his qualifications as a rate auditor. After a few questions had been asked and answered as to his experience in this field, the court refused to permit counsel to pursue this line of interrogation further. We see no abuse of discretion in the court's ruling. Certainly, no prejudice is shown. Full opportunity was given counsel for defendant to cross-examine the witness on his direct testimony and thus develop whether or not he had correctly applied the decisions, orders and rates established by the Railroad Commission to the facts at hand, for the transportation of cast iron pipe and fittings.

■ Defendant's next point is that the rates fixed by the Railroad Commission's decision and order No. 29313, case No. 4088, part ''C,'' generally referred to as the oil well supply order, are not applicable. (The Gardner case and the second cause of action in the Heffron case are based on said decision and order.) This proposition seems to be based on the idea that the Railroad Commission could not have intended to include cast iron pipe and fittings in the oil well supply group because these commodities are not in general use in the oil industry. The answer to this argument is found in the said decision and order. Section 1 of Appendix A to said order is entitled ''Commodity Rates.'' The subheading is ''Commodities for which rates are provided in this Appendix.'' Next appears ''Item No. 10.'' The heading under this item as amended by decision No. 30106 is ''Oil, Water or Gas Well Outfits and Supplies, *and other Articles*'' (italics added). Under said item No. 10 is a list of commodities for which rates are thereby established which covers nearly two pages. In this list of commodities is the following: ''Pipe or Tubing and Fittings, Cast or Wrought.'' Thus we find that the particular commodity which plaintiffs' assignors transported for defendant is specified as one of those for which transportation rates were established in the oil well supply order.

The inclusion of cast iron pipe and fittings in said order was not by accident or mistake. The propriety of including these commodities in the oil well supply order was recommended to the Railroad Commission during the course of the

hearings to establish rates for highway contract carriers. This is pointed out in the commission's decision No. 29313. It is there said that the ''Carriers suggest that the oil well supply group should include the articles enumerated under the heading of 'Oil, Water or Gas Well Outfits and Supples' in the Western Classification, and in addition, pump working barrels (well pump cylinders), oil well countershafts, sucker rod joints, sucker rods, pump working barrel valves, and the following iron and steel articles: boiler flues, boiler tubes, *cast iron pipe and fittings,* wrought iron pipe or tubing and fittings, pipe or tubing (not cast or wrought) plate or sheet, 16 gauge or thicker. Certain of those representing shippers concurred in this suggestion.'' (Italics added.)

It is also pointed out in this same decision of the Railroad Commission that rates may not properly be based upon the *use* which is to be made of the commodity. This is what the commission had to say on this question: ''Manifestly an arrangement whereby one set of rates is provided for the movement of traffic to other than oil well supply houses and another and different set of rates is maintained for the movement of the same traffic destined to oil well supply houses, all located at the same destination, is unsound and discriminatory. *It has repeatedly been held that rates may not properly be made dependent upon the use which is to be made of the commodities transporte*d. (*United Dredging Co.* v. *A. T. & S. F. Ry. Co.,* et al. (1922), 22 C.R.C. 559.)'' (Italics added.)

Furthermore, the amendment of the heading under item No. 10 by the addition of the words ''and other articles'' indicates an intention not to limit the commodities covered by this rate order to those which were generally used in the oil industry.

It is therefore clear that the rate established in the oil well supply order for the transportation of cast iron pipe and fittings was applicable to the appropriate causes of action in these cases.

 Defendant's next contention is that it was error to use the freight bills rather than shipping orders or bills of lading as the basis for computing the undercharges. There might be some point to this contention if it had been established that the defendant tendered shipments to the carrier in lots of more than 30,000 pounds, so as to be entitled to the lower rate per 100 pounds, because of the quantity of the shipment, and that the carrier had broken up the shipments into smaller

lots so that each lot fell into a lower weight bracket and therefore carried a higher freight rate per 100 pounds and that the carrier had billed these smaller lots as separate shipments at the higher rates. ("Shipment means a lot received from one shipper on one shipping order or bill of lading at one point of origin at one time for one consignee at one destination" according to the definition promulgated in the oil well supply decision and order.) This question, however, is not presented for it is not established that defendant actually tendered to the carrier any such specific "shipment" and that the carrier then broke it up into smaller lots and shipped it at higher rates. If defendant claimed that it had complied with the definition of a shipment and was therefore entitled to a lower rate than that actually charged, it should have presented shipping documents or other satisfactory proof thereof. This was not done.

Furthermore, it is provided in the oil well supply order that every "highway contract carrier shall issue to the shipper, *for each shipment received* for transportation, a freight bill in substantially the form set forth in Appendix 'B' hereof." (Italics added.) The form set forth in said appendix has the heading "Shipping Order and Freight Bill." It is thus apparent that the form prescribed by the Railroad Commission may serve a dual purpose of being both a shipping order and a freight bill. This form appears to have been used in the transactions involved in the Heffron case. The failure to use this form or to have it completely filled out cannot, of course, for reasons of public policy prevent the plaintiffs' recovery of undercharges. (*Johnston* v. *L. B. Hartz Stores, supra;* 13 C.J.S. 876.) In the Gardner case where the approved form does not appear to have been used by the carrier the defendant in its answer admits that exhibit "A" attached to the second amended complaint contains a correct statement of the freight bill numbers, the date of each *shipment,* the rate charged and paid to plaintiff's assignor by the defendant, and the consignee and destination. Under the circumstances the trial court was entitled to rely on the data contained in the freight bills as reflecting the shipments that were made and to use said data as a basis for computing the undercharges.

Defendant further contends that the court erred in admitting in evidence the freight bills upon the ground that no foundation was laid for their introduction, and that certain freight bills were missing and were prepared from other rec-

ords by the witness Faus. We see no reason why the freight bills and shipping orders which were the documents under which the commodity was transported in the Heffron case were not admissible in evidence. In the Gardner case all the evidence which these records would tend to establish was admitted in the pleadings. As to the missing freight bills a notice was served upon defendant to produce the particular records which were missing. The documents were not produced. This laid sufficient foundation for the introduction of secondary evidence. It was made up from an examination of the books and records of the defendant and from those of the bankrupt produced through the trustee in bankruptcy. These two records were then checked together against the accounts receivable ledger and the dispatching book. This gave the witness a three way check on the items that should have been on the missing documents. Such secondary evidence was properly admitted.

 Defendant also contends that no evidence could be received in the Gardner case because the bankrupt had not complied with section 2466, Civil Code, concerning the filing and publication of a notice of doing business under a fictitious firm name. The plaintiff as trustee in bankruptcy, however, did execute in his name a certificate in the form required by said code section and caused the same to be published and filed prior to filing the complaint. Defendant argues that the plaintiff is not entitled to do this. We think it places too narrow a construction on the code section. It was held in *Goldtree* v. *Swinford* (1888), 74 Cal. 586 [16 P. 493], that an agent holding a power of attorney could sign and acknowledge such a certificate for his principal. The court said (p. 589): ". . . we think that the certificate so signed and acknowledged satisfied the requirements of the code. The object of those requirements is doubtless quite as well subserved by having it signed and acknowledged by an agent as it would be if it were personally signed and acknowledged by the principal. And the provisions of the code and all proceedings under it are to be liberally construed, with a view to effect its objects and to promote justice." To hold contrary to the trial court on this point would mean that none of the debts owing to the bankrupt estate could ever be collected by suit. "Plainly the code provisions were not designed to work that result." (*Henning* v. *Clark* (1920), 46 Cal.App. 551 [189 P. 714].)

 Defendant also argues that these actions are being prosecuted by an unlicensed collection agent in violation of the collection agency laws of the state and should therefore be dismissed. This proposition is based on the fact that witness Faus has a contract with the trustee in bankruptcy to audit the business of these carriers on a contingent basis of 50 per cent of any recovery. This contingent fee includes any legal expense that may be incurred. It is of course fundamental that one of the primary duties of a trustee in bankruptcy is to preserve and collect the assets of the bankrupt and to prosecute any actions necessary to accomplish this end. These actions were authorized by the bankruptcy court and the trustee in bankruptcy is the plaintiff. The trustee was duly authorized by the bankruptcy court to employ Faus, who appears to be well versed in rate matters, to make the necessary audits and otherwise assist the trustee in the performance of his duty to collect any undercharges that might be discovered. Faus was not acting as a collection agency within the meaning of the collection agency law of this state.

After the conclusion of the trial the judge prepared a memorandum opinion directing judgments for defendant. Findings of fact, conclusions of law and judgments were accordingly prepared and signed by the court.

Thereafter, in each case, the plaintiff filed (1) Notice of Intention to Move for New Trial, and (2) Notice of Motion to. set aside and vacate judgment and to enter new and different judgment under section 663, Code of Civil Procedure. As a result of the motions that were made pursuant to said notices the court set aside the findings of fact, conclusions of law and judgments and reopened said cases for further evidence which was received. The court thereupon decided the cases for the plaintiffs. New findings, conclusions of law, and judgments were accordingly entered.

Defendant challenges these proceedings. It claims that the court erred, (1) in reopening the cases, (2) in receiving evidence before the findings and judgments were vacated and set aside, and (3) in adopting different findings on a motion made under section 663, Code of Civil Procedure. None of these claims is well founded.

 Section 662, Code of Civil Procedure, provides that the court, in ruling on a motion for a new trial in a case tried without a jury (and these cases were so tried), ''in lieu of

granting a new trial, may vacate and set aside the findings and judgment and reopen the case for further proceedings and the introduction of additional evidence with the same effect as if the case had been reopened after the submission thereof and before findings had been filed or judgment rendered.'' Under this provision the court had ample authority, and it was within its discretion, to reopen the cases for the introduction of additional evidence. There was clearly no abuse of discretion in this ruling.

During the argument on the motions counsel for plaintiffs asked that the findings and judgment be set aside and the case be reopened. Later the court said, ''we will re-open the case and the plaintiff may put on such testimony as he is advised, subject to objections and rulings thereon, and the defendant may do the same thing.'' While the trial judge did not in so many words say that the findings and judgment are vacated and set aside, that was undoubtedly the intention of the court for he was obviously intending to grant the request that counsel for the plaintiff had made. That such was the purpose and intention of the court is made manifest from the judgment the court later signed. It is there recited that ''said Motions having been presented to the Court on said 14th day of September, 1943, and having been argued on said date, and *the Court having set aside the Findings of Fact and Conclusions of Law and Judgment and re-opened said case for further evidence. . . .*'' (Italics added.) It seems that it must have been understood by counsel for defendant that procedurally the findings, conclusions of law and judgments were being set aside, else some objection raising this point would then have been made. It is clear that he understood that the cases were reopened for further evidence because he read to the court from a statement previously prepared as follows: ''On the application of the plaintiff, the court has *re-opened these cases* to permit the plaintiff to offer evidence as to another rate schedule. . . .'' (Italics added.) Counsel does not appear to have been misled or the defendant prejudiced by any incompleteness in the statement of the court in his ruling.

An examination of the minutes of the court covering these proceedings reveals that they are somewhat ambiguous and uncertain. If only the first sentence is read it would

appear that the trial court was attempting to proceed under section 663, Code of Civil Procedure. The two following sentences, however, disclose that the court was deciding the cases in favor of the plaintiffs instead of the defendant in whose favor they had been previously decided; that new findings of fact and conclusions of law were to be drafted by the attorney for the plaintiffs consistent with judgment for the plaintiffs; and that the motions for a new trial were denied. These latter provisions would indicate that the court was proceeding under section 662, Code of Civil Procedure. The fact that different findings were prepared at the direction of the court by counsel for the plaintiffs and were signed by the court and filed, is a further indication that the court was proceeding under the authority of that section. In such circumstances the statement of the court in *Roraback* v. *Roraback* (1940), 38 Cal.App.2d 592 [101 P.2d 772], at page 596, is pointedly applicable. It is there said: "The true measure of an order, however, is not an isolated phrase appearing therein, but its effect when considered as a whole. [Citing cases.] In construing orders they must always be considered in their entirety, and the same rules of interpretation will apply in ascertaining the meaning of a court's order as in ascertaining the meaning of any other writing. If the language of the order be in any degree uncertain, then reference may be had to the circumstances surrounding, and the court's intention in the making of the same. [Citing cases.]" Applying this rule to the circumstances surrounding the making of the order and the action of the court pursuant thereto it is apparent that it was the court's intention to set aside the findings of fact, conclusions of law and judgments and to decide the cases upon all the evidence, including that which had been received upon the cases being reopened, for the plaintiffs. This could only be done under section 662, Code of Civil Procedure. The provisions of this section are to be liberally construed to achieve the purpose it was designed to accomplish. (*Roraback* v. *Roraback, supra,* p. 597.)

This procedural problem was considered in *Gossman* v. *Gossman* (1942), 52 Cal.App.2d 184 [126 P.2d 178]. It was there pointed out that (p. 198): "The record discloses that plaintiff's motion for a new trial was denied and her motion under sections 663 and 663a [C.C.P.] was granted." "But," says the court, "this does not mean that the order modifying

and changing the judgment was not made pursuant to the authority vested in the trial court on a motion for new trial by the terms of section 662 of the Code of Civil Procedure. The authority, within the limits stated, may be exercised *in ruling on the motion* whether it be granted or denied.'' The court proceeded to say that (pp. 198-199) : ''In view of the fact that . . . the court, on hearing plaintiff's motions . . . evidently did reopen the case and receive further evidence or at least did re-examine the evidence before it—a procedure which it could not follow under sections 663 and 663a [citing cases]—it becomes obvious that the court was proceeding under section 662. . . .'' So, here, although the court did not mention section 662, Code of Civil Procedure, or follow the language thereof, it should be held that it was proceeding under the authority of that section.

Since the court was proceeding under section 662, Code of Civil Procedure, in reopening said cases and in receiving the additional evidence, it follows that it was then the duty of the court to make such new findings of facts, conclusions of law and order such judgments as each case in its entirety required. This point is made clear in *Wyman* v. *Monolith Portland C. Co.* (1935), 3 Cal.App.2d 540 [39 P.2d 510]. At page 545 the court had this to say: ''The next point urged by appellant is that the trial court had no right upon the motion for a new trial to change the findings and modify the judgment. At the conclusion of the trial, judgment was ordered in favor of defendant cement company, and thereafter findings were prepared and a judgment entered. Later, upon motion for a new trial, the court denied the motion for a new trial and vacated and set aside the judgment, findings and conclusions of law theretofore entered, and ordered judgment for plaintiffs, and prepared and filed new findings and conclusions of law and judgment in accordance therewith. This the court did under the authority granted by section 662 of the Code of Civil Procedure, and properly so if it believed the original findings and judgment were erroneous. The very purpose of the section is to permit a court to correct its own errors without incurring the delay and expense incident to a new trial or appeal.'' The fact that the court erroneously attempted to accomplish the result it did in these cases by also granting the motions under section 663, Code of Civil Procedure, does not detract from the legal effectiveness of the

new findings and judgments, which were made pursuant to the authority of section 662, Code of Civil Procedure, in connection with the ruling on the motions for a new trial.

The evidence is ample to support the judgments.

The judgment in each case is affirmed.

Desmond, P. J., and Wood (Parker), J., concurred.

A petition for a rehearing was denied May 11, 1945, and appellant's petition for a hearing by the Supreme Court was denied June 12, 1945.