[L. A. No. 23816.   In Bank.   Mar. 2, 1956.]

HERBERT HISCHEMOELLER, Respondent, v. NATIONAL ICE AND COLD STORAGE COMPANY (a Corporation), Appellant.

James D. Garibaldi, Gavin McNab, Schmulowitz, Sommer & Wyman, Nat Schmulowitz, Peter S. Sommer and Ronald P. Klein for Appellant.

McBain & Morgan, Newell & Chester, Newell, Chester & Gibson and Robert M. Newell for Respondent.

McCOMB, J.—Plaintiff sues defendant warehouseman for damages resulting from negligence in the storage of certain dried chili peppers. The case was tried before a jury and verdict rendered for plaintiff in the sum of $23,112.30. Defendant has appealed.

Defendant is a public warehouseman and as such a public utility. (Pub. Util. Code, §§ 216, 239.) It is also governed by the Food Warehousemen Act (Pub. Util. Code, §§ 2501-2574), which defines food warehousemen as public utilities (§§ 2502, 2507). Section 2551 requires the filing with the Public Utilities Commission (formerly Railroad Commission) of "schedules showing all rates and charges, which are in force for warehousing and storage services of every description, including sorting, handling, weighing, elevating, and packing charges, and all charges directly or indirectly connected with such services, together with all rules which in any manner affect or relate to rates or charges, and showing plainly when they became effective. The rates shall be uniform in their operation and shall apply with equal force and effect to all persons or corporations dealing with the food warehouseman." Section 2552: "Every food warehouseman doing business in the State shall print and keep open to public inspection at each building, structure, warehouse, elevator, or plant maintained by him in this State copies of the schedules filed with the commission pursuant to Section 2551."

Defendant has filed, and kept open to public inspection as required schedules covering its rates and other charges. One of them is Cold Storage Warehouse Tariff No. 12, C. R. C. No. 87, which contains a rule 70-B reading as follows: "LIMITED LIABILITY.—For the purpose of fixing storage rates and the maximum limit of the warehousemen's liability, the value of merchandise stored shall be conclusively deemed not to exceed, per ton of 2000 lbs.—

| | |
|---|---|
| "for potatoes and onions | $ 50.00 |
| for all other vegetables and for fruits and fish[1] | 100.00 |
| for frozen packaged processed foods.. | 200.00 |
| for butter, eggs and cheese | 500.00 |
| for all other merchandise | 200.00 |

unless the person to whom the warehouse receipt is issuable declares, when such merchandise is offered for storage, that it is of greater value and such greater value is noted on the warehouse receipt by the warehouseman, in which case the

---

[1] "Chili peppers fall in this category."

value shall be conclusively presumed not to exceed that so declared. The specified tariff storage rates are minimum rates which apply where no value is so declared and noted, or where, if declared, it does not exceed the otherwise presumed limit; and where such declared value exceeds such otherwise presumed limit, an additional rate will be added and charged equivalent to one-quarter of one per cent of the amount of such excess for each month or part thereof. The warehouseman's liability is limited to and shall in no event exceed whichever is smaller of the actual value, or, as the case may be, such presumed or declared limit of value in respect of which the storage rate is so fixed and payable. Such presumed or declared value as an agreed limit, and likewise such limitation of liability, applies separately and proportionately on a weight basis to each part of the stored merchandise; and liability, if any, for any partial loss of or injury to any part thereof shall not exceed that portion of such limited liability with respect to such part, proportionate to the actual loss of or damage thereto.

"The option of declaring such increased value rests with the customer and the warehouseman may not insist upon it." Cold Storage Warehouse Tariff No. 2-D, C.R.C. No. 86, also on file, provided a minimum storage rate of 25 cents per hundred pounds of chilies for the first month and 12½ cents per month for each succeeding month, provided same were in lots of 10,000 pounds or over (as was the case here).

The peppers were originally stored in 1949 by Gonzales and Blanco, who declared no value, and then received two "Memorandum Acknowledgments" on which defendant acknowledged receipt from them of the peppers "To be placed in Cold Storage Subject To Limited Liability and other Terms and Conditions as Shown By Warehouse Receipt and/or Rules and Regulations on File with the Railroad Commission of the State of California." It is a fair inference that conforming warehouse receipt was issued to Gonzales and Blanco. In January 1950 plaintiff, who had had considerable experience with certain types of warehousing, arranged for Security-First National Bank of Los Angeles to finance the deal and purchased the chilies, still in warehouse, from Gonzales and Blanco. Upon authorization from the sellers defendant issued to plaintiff two documents entitled "Transfer Memorandum," which bore these words at the bottom: "This Merchandise is Stored Subject to Limited Liability and other Terms and Conditions as shown by Warehouse Receipt and/or

Rules and Regulations on File in This Office and with the Railroad Commission of the State of California.''

At plaintiff's request defendant issued the warehouse receipts to Security-First National Bank of Los Angeles as pledgee for HISMOCO (American Co.)[2]

The document certifies that defendant has received the goods ''subject to all of the terms and conditions contained herein and on the reverse hereof.'' At the bottom of the face of the receipt is this: ''**NOTE. Rates for storage, handling and other services are as fixed by law in Tariffs filed with the Railroad Commission of California and in our office, notwithstanding omission to state same here or erroneous statement thereof.'' Also: ''THE PARTY ACCEPTING THIS RECEIPT THEREBY AGREES TO ITS CONDITIONS.'' On the reverse side are ''Standard Terms and Conditions'' which include the following: ''These goods are stored and handled subject to the rules, regulations, rates and charges as published in our warehouse schedules on file with the Railroad Commission of California and in our office, and such amendments thereto as may hereafter be filed.'' Also: ''Rates are subject to limited liability as provided by the Tariffs on file with the Railroad Commission and in this office.'' Neither plaintiff nor the bank made any declaration of value of the peppers at any time.

They were inspected by plaintiff before his purchase in January 1950 and every two or three months during 1950 and found to be in good condition, at least as late as September 1950. When withdrawn from storage in January and February 1951, the chilies were moldy and damaged. They were sold for $5,131.10, resulting in a loss of $23,112.30, the amount of the verdict.

Defendant insisted throughout the trial that its liability was limited, as a matter of law, to $100 per ton of 2,000 pounds, because no higher value was declared and no greater rate than 12½ cents per hundred pounds was charged to or paid by plaintiff. Plaintiff, on the other hand, tried the case upon the theory that such a limitation of liability, based upon an agreed value, does not bind the bailor unless he voluntarily accepts a warehouse receipt so declaring and does it with full knowledge and understanding on his part. The trial judge accepted this thesis as correct and instructed the jury accordingly.

---

[2]This was plaintiff's trade name.

■ Defendant contends that the trial judge committed prejudicial error:

*First*: In instructing the jury as follows: "While a contract of storage between a warehouseman and the owner of property being stored may, under proper circumstances, contract to limit the amount which the owner may recover from the warehouseman in the event the latter should be liable for loss or damage to the property, such special contract of limitation must be freely and fairly made between the parties and it must appear that the owner of the property accepted the contract with knowledge of its terms, such knowledge being a necessary condition to the owner's assent to the limitation.

"It follows that with respect to any special contract limiting liability on which the defendant in this action may rely, the defendant has the burden of proving that the plaintiff accepted such special contract limiting liability with knowledge of its terms. Should defendant fail in this burden, then its defense based upon such special contract must also fail."

This instruction was erroneous because it required actual notice by plaintiff of the warehouse receipt, etc., and placed the burden on defendant to prove the fact. There was no evidence of unfair dealing or anything departing from the ordinary course of business conducted by businessmen.

■ *Second*: In refusing to give defendant's requested instruction reading: "If you find that when the non-negotiable warehouse receipt (Plaintiff's Exhibit 1) was received by the plaintiff from the Security-First National Bank of Los Angeles, the circumstances were such that a prudent man could and would have read the limitation of liability on the document, then you are instructed that in law the plaintiff had notice of the limitation of liability.

"If you find that when the non-negotiable warehouse receipts (Plaintiff's Exhibit 1) and the transfer memorandum (Defendant's Exhibit A) were received by plaintiff's agents acting for him the circumstances were such that a prudent man could and would have read the limitation of liability on these documents, then you are instructed that in law the plaintiff had notice of the limitation of liability."

The requested instruction was a correct statement of the law covering defendant's secondary theory of the case and should have been given. (*Merrill* v. *Pacific Transfer Co.*, 131 Cal. 582, 587 [63 P. 915]; *Curtis* v. *United Transfer Co.*, 167 Cal. 112, 114 [138 P. 726].)

■ Plaintiff did not make the original deposit of the chilies. He bought them from Gonzales and Blanco, who had warehoused them at the minimum rate; he paid the minimum amount, made no inquiry about the storage charge or any other phase of the existing bailment, and requested issuance of new receipts to his pledgee after receiving a ''Transfer Memorandum'' expressly referring to limited liability. He made no examination of any pertinent document, received the warehouse receipts from the bank when he paid off the loan in September 1950, and held the same until January 31, 1951, making periodic inspection of the peppers, but paying no attention whatever to the terms of his contract. If he was ignorant at all times as to the terms of the documents it was a case of conscious ignorance for which he can blame no one but himself or his own agents.

■ The trial judge gave an instruction,[3] which plainly told the jurors that actual knowledge and understanding on

---

[3] ''In order that the terms of another document can be incorporated by reference into a contract so as to bind the parties to that contract, the reference to said other document must be called to the attention of the party to be charged therewith and such party must consent thereto and the terms of the incorporated document must be known to or easily available to the contracting parties.

''While a contract of storage between a warehouseman and the owner of the property being stored may, under proper circumstances, contract to limit the amount which the owner may recover from the warehouseman in the event the latter should be liable for loss or damage to the property, such special contract of limitation must be freely and fairly made between the parties and it must appear that the owner of the property accepted the contract with knowledge of its terms, such knowledge being a necessary condition to the owner's assent to the limitation.

''It follows that with respect to any special contract limiting liability on which the defendant in this action may rely, the defendant has the burden of proving that the plaintiff accepted such special contract limiting liability with knowledge of its terms. Should defendant fail in this burden, then its defense based upon such special contract must also fail. . . .

''Did the defendant's breach of contract proximately cause any loss or damage to the plaintiff?

''If you answer that question in the negative, the plaintiff would still be entitled to a verdict but would not be entitled to any compensatory damages. If you answer the last question in the affirmative, you will then find what loss or damage the defendant's breach of contract caused the plaintiff and return a verdict in his favor for the amount thereof. . . .

''Was that negligence the proximate cause of damage to the plaintiff's goods?

''If you answer that question in the negative, plaintiff is not entitled to recover on that issue, but if you answer it in the affirmative, you then will find what damage plaintiff thus has been caused to suffer and return a verdict in his favor for the amount thereof. . . .

''If under these circumstances you should find that the plaintiff is entitled to a verdict, it will then be your duty to award plaintiff such

plaintiff's part of the clauses limiting liability were essential to any such limitations. This was erroneous.

██ Defendant claims the schedules with their rates and regulations and limitations of liability issued by the Public Utilities Commission automatically became implied terms of any contract made between a public utility and its customer. Also that absence of actual knowledge of these terms on the part of the customer is legally inconsequential.

This contention is correct. In *Gardner* v. *Basich Bros. Const. Co.*, 44 Cal.2d 191, 193 [1a] [281 P.2d 521], Mr. Justice Spence, speaking for this court, said: "However, as stated in *Gardner* v. *Rich Mfg. Co.*, 68 Cal.App.2d 725, 730 [158 P.2d 23], the prescribed rules and rate regulations 'become a part of every contract between a highway contract carrier and the shipper.' " Again at page 194 [1-b] : "The prescribed rate provisions and regulations are deemed a part of every such contract, and the parties are deemed to have contracted with such provisions in mind, for otherwise the state's rate-making policy expressed in the Highway Carriers' Act would not be effectual. (*Gardner* v. *Rich Mfg. Co., supra,* 68 Cal.App.2d 725, 729-730.) "

In *Gardner* v. *Rich Mfg. Co.*, 68 Cal.App.2d 725 [158 P.2d 23] (hearing denied by the Supreme Court), at page 730 [2]-[3], it is said: "The schedule of minimum rates thereby established and prescribed and the rules and regulations governing the same become a part of every contract between a highway contract carrier and the shipper. (Citing cases.) The tariff applicable, on the facts, to any particular shipment cannot be changed by an agreement between the parties (citing cases), and the carrier or its assignee is entitled to collect the proper rate. (13 C.J.S. § 393, pp. 873-875; see also note, 83 A.L.R. 245 et seq., and cases there cited.) Otherwise, the statute would be ineffectual for the purpose for which it was enacted." (See also *S. Toepfer, Inc.* v. *Braniff Airways,* 135 F.Supp. 671, 672.)

Both sides rely somewhat upon *George* v. *Bekins Van &*

---

amount of damages as will compensate him for the loss or damage suffered by him as a proximate result of the defendant's breach of contract or negligence, if any.

"The measure of such loss in the case at bar is the difference between the reasonable market value of the plaintiff's chilies as of February 1, 1951, and the reasonable net salvage value of the chilies to the plaintiff.

"In determining the reasonable net salvage value of the chilies, you should deduct from the reasonable gross salvage the reasonable costs actually incurred by the plaintiff, if any, in reconditioning the chilies."

*Storage Co.*, 33 Cal.2d 834 [205 P.2d 1037], which arose under the Uniform Warehouse Receipts Act (now comprising Civ. Code, §§ 1858.01-1858.85). It was an action to recover the value of certain furniture which was destroyed by fire while stored in defendant's warehouse. The warehouse receipt expressly limited liability to $10 per 100 pounds in the absence of a greater value declared in writing; and there was no such declaration. It appeared further that the storage was originally arranged by telegrams and that later the plaintiffs, upon receiving from defendant a warehouse receipt, signed and returned a written acceptance of same. The receipt stated in bold type and on its face the limitation of liability to $10 per 100 pounds. The court held the limitation to be valid and binding and reduced the judgment accordingly. Having held that this valuation clause was a proper permissive provision under section 3 of the act, the court said (p. 847) that "The validity of such valuation clauses does not depend on the relationship between the actual value and the stipulated value, or on whether the carrier or bailee has knowledge that the actual value is greater than the stipulated value." Again at page 848 [17]-[19]: "The question remains whether plaintiffs agreed to the stipulated value of their goods in this case. When goods are delivered to a warehouseman for storage and no warehouse receipt is issued at the time of delivery, an implied contract of storage arises containing those terms required by law. If this contract is to be superseded by the contract contained in the subsequently issued warehouse receipt, it is necessary that the bailor agree to the written contract as proposed by the bailee. . . . Plaintiffs signed and returned to defendant a written acceptance of the warehouse receipt and contract. By so doing they accepted defendant's offer to store the goods at a rate based on the value clearly stated on the face of the receipt." It was further held (p. 848) that ". . . it is immaterial on the facts in this case that neither [plaintiff] read the contract they accepted." And (p. 849) [20], "By issuing its warehouse receipt defendand proposed the terms to plaintiffs on which it would continue to store the goods. Plaintiffs accepted this offer, and defendant's continued performance of the contract as bailee was adequate consideration to support the limitation clause."

At page 850 it is said: "In the present case, however, the rates were in fact determined by the declared value and had the declared value not been agreed to by plaintiffs the

rates would have been increased in accord with the statement to that effect in the warehouse receipt. (See *Bassi* v. *Springfield Fire etc. Ins. Co.*, 57 Cal.App. 707, 712 [208 P. 154].)'' The judgment was modified by reducing same from $3,126.15 to $501.40, a value based on $10 per 100 pounds. Since the warehousing of secondhand household goods is excluded from the Public Utilities Act (Pub. Util. Code, § 239, subd. (b)), this case did not discuss the act or any of the other statutes regulating warehouses as public utilities. It does stand for the proposition that one who accepts and retains a warehouse receipt without bothering to know its contents is bound by its terms. The case is in no respect inconsistent with defendant's contentions herein.

█ Although defendant is a public utility within sections 216 and 239 of the Public Utilities Code, and hence subject to all its applicable provisions, it is governed primarily by the Food Warehousemen Act (Pub. Util. Code, §§ 2502, 2507) which, at any points of conflict, prevails over the Public Utilities Act. (Pub. Util. Code, § 2506.) Section 2551, above quoted, requires the filing of schedules showing all rates and charges of every kind, together with all rules which in any manner affect or relate to rates or charges and concludes as follows: ''The rates shall be uniform in their operation and shall apply with equal force and effect to all persons or corporations dealing with the food warehouseman.'' The commission may make such changes therein as it deems proper. (§ 2553.) And, unless it does so ''. . . no change shall be made by any food warehouseman in any rate or charge'' except by permission of the commission. (§ 2554.) Section 2556, subdivision (b), provides that no such warehouseman shall ''Demand, collect, or receive, directly or indirectly from any person or corporation, any different sum for warehousing or storage services than the rates and charges filed with the commission.'' The statute applies not only to the warehouseman but also to the customer, the bailor. ''No person, or corporation shall solicit, accept, receive, or attempt to obtain from any food warehouseman any rate or charge not filed with the commission.'' (§ 2557.) Section 2531 forbids all forms of discrimination; section 2532 makes it ''. . . unlawful for any person or corporation to solicit, accept, receive, or attempt to obtain from any food warehouseman any rebate, discount, deduction, concession, refund, or remittance, or to solicit, accept, receive, or attempt to obtain from any food warehouseman, any preference, or advantage,

either in rates or charges, or in service or facilities afforded.'' Section 2534 reads: ''Every contract, expressed or *implied*, made by any person or corporation in violation of the provisions of this article or of Article 3 of this chapter, is illegal and utterly void and no recovery thereon shall be had.'' (Emphasis added.) Lastly, section 2574 declares it a misdemeanor to violate or procure, aid or abet any violation of the statute.

These statutory provisions compel the conclusion that the principles announced in *Gardner* v. *Rich Mfg. Co., supra,* 68 Cal.App.2d 725, are controlling here. Plaintiff urges that the George case, *supra,* holds that in the absence of delivery of a warehouse receipt at the time of receiving the goods ''an implied contract of storage arises containing those terms required by law.'' It is contended that this would not read an agreed valuation into the contract because its inclusion in the tariff was optional with the warehouseman. This overlooks the fact that that provision, once included in the schedule and not disapproved or changed by the commission, must be observed by bailor and bailee and no departure can be made from it unless or until a change is approved by the commission. Moreover, under section 2534 no contract may contain an express or implied term at variance with that or any other provision of the tariff. It was specifically held in *Kings Laboratories, Inc.* v. *Yucaipa Valley Fruit Co.,* 18 Cal.App.2d 47 [62 P.2d 1054], that a contract for storage of fruit at a rate less than that authorized by the commission violates the Food Warehousemen Act and is illegal and void. (See also to the same effect, *J. Breuner Co.* v. *Western Union Tel. Co.,* 108 Cal.App. 243 at 250 [291 P. 445] ; *Butler* v. *Bell Oil & Refining Co.,* 70 Cal.App.2d 728, 730 et seq. [161 P.2d 559] ; *American Railway Express Co.* v. *Daniel,* 269 U. S. 40 [46 S.Ct. 15, 70 L.Ed. 154].) Any statements in *Scott's Valley Fruit Exch.* v. *Growers Refrigeration Co.,* 81 Cal.App. 2d 437 [184 P.2d 183] ; *McQueen* v. *Tyler,* 61 Cal.App.2d 263 [142 P.2d 466] ; and *Fitch* v. *Carpenter,* 70 Cal.App.2d 827 [161 P.2d 824], contrary to the rule announced in *Gardner* v. *Basich Bros. Const. Co., supra,* and which are relied on by plaintiff, are expressly disapproved.

The facts in the present case disclose an ordinary business transaction between businessmen. There is no suggestion of sharp dealings or unfair practices on either side. Plaintiff bought what he paid for, and paid for what he bought. There

appears to be no good reason for denying defendant the benefit of the limitation of liability set forth in the contract.

The judgment is reversed.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., and Spence, J., concurred.

CARTER, J., concurring.—I agree with the result reached in the majority opinion for the reasons expressed by Mr. Justice Ashburn, pro tem., of the Second Appellate District, Division Three (*Hischemoeller* v. *National Ice & Cold Storage*, (Cal.App.) 284 P.2d 81). In so doing, I expressly withhold any approval of the majority opinion in *George* v. *Bekins Van & Storage Co.*, 33 Cal.2d 834 [205 P.2d 1037]. I pointed out in my dissent in the George case that plaintiffs there received their warehouse receipt which contained the limitation on liability notice over a month from the time the contract of bailment became effective; that the warehouse receipt subsequently received by plaintiffs modified the original contract of bailment; that such modification was void and ineffectual because unsupported by consideration. The George case is not, and should not be, authority for the case under consideration since here plaintiff's predecessors in interest received ''Memorandum Acknowledgments'' at the time of the bailment. These documents contained a notification that the peppers were accepted subject to limited liability on the part of the bailee as provided for in the rules and regulations on file with the Railroad Commission. There was no attempt here to alter, or modify, the original contract of bailment.